182 So.2d 170 (1966)
Slathern E. GASSIOTT, Sr., et al., Plaintiffs-Appellants,
v.
M. L. GORDEY, d/b/a Gordey's Supermarket, Defendant-Appellee.
No. 1606.
Court of Appeal of Louisiana, Third Circuit.
January 18, 1966.
*171 Teekell & Nugent, by Howard N. Nugent, Alexandria, for plaintiffs-appellants.
Provosty, Sadler & Scott, by LeDoux R. Provosty, Jr., Alexandria, for defendant-appellee.
Before FRUGÉ, SAVOY and HOOD, JJ.
SAVOY, Judge.
This is an action in tort instituted by Slathern E. Gassiott, Sr., and his son, Slathern Evans Gassiott, against M. L. Gordey, d/b/a Gordey's Supermarket, arising out of the death of five cows. For convenience, plaintiffs will sometimes be referred to as Mr. Gassiott, Sr. and Mr. Gassiott, Jr. It is alleged that defendant caused a load of discarded merchandise and substances from his mercantile establishment to be dumped on the open range near the home of Mr. Gassiott, Sr., north of Glenmora in Rapides Parish, Louisiana; that certain of the substances and compounds dumped contained arsenic; that plaintiffs' cows ate these substances and died from arsenic poisoning. It is alleged that defendant was negligent in disposing of the dangerous and deadly substances on the open range, where cattle customarily grazed, without taking safeguards for the protection of livestock; and, in failing to deposit these substances in the area provided by the Town of Glenmora for depositing refuse.
The defendant filed an answer in which the allegations of plaintiffs' petition were denied, and it was alleged that if the defendant were negligent in disposing of poisonous substances as alleged by plaintiffs, then plaintiffs were contributorily negligent in allowing their livestock to graze in an area set aside and used by the Town of Glenmora, and its residents, as a dump.
After a trial on the merits, the district court rendered judgment for defendant, and the plaintiffs have appealed to this Court.
*172 Plaintiffs contend that the district court erred in finding plaintiffs had not carried the burden of proof in the case. With reference to the holding by the district court that the source of the deadly substances which killed the cows had not been identified with the definiteness and reasonable certainty required by law, plaintiffs maintain that the trial court, in effect, required plaintiffs to show that no other source of arsenic existed, no matter how remote, academic or improbable. It is urged that the circumstantial evidence presented was sufficient to prove all necessary elements of the case to a reasonable degree of certainty and was sufficient to exclude with a fair amount of certainty every other reasonable hypothesis, other than the one relied upon.
The defendant maintains that plaintiffs have presented only an interesting set of circumstantial possibilities concerning the death of the five cows, and a suggested cause thereof, but they have not shown by a preponderance of the evidence that the defendant was responsible for the tragedy. It is urged that the facts do not show that the substances dumped from the defendant's store contained arsenic, or that such arsenic from this pile of rubbish was consumed by the plaintiffs' cows, or that such caused the death of the cows, and, alternatively, that the defendant was not guilty of negligence in disposing of trash and rubbish from his place of business in the area set aside as a dump for the Town of Glenmora.
The record shows that Slathern E. Gassiott, Sr., who lives on the Melder Highway just north of Glenmora, in Rapides Parish, Louisiana, owns about fifty head of cattle that graze on the open range in the area of his home. His son, Slathern Evans Gassiott, who lives in Port Arthur, Texas, also owns some cattle that range with his father's herd. Some of the cattle return each evening to the barnyard at Mr. Gassiott's home, and are penned in for the night.
Across the highway from Mr. Gassiott, Sr's home and to the south of Melder Highway, there is located property belonging to Mr. Gassiott, Sr., Roy O. Martin, and the Pringle Estate. The Pringle property is eroded with ditches, and by agreement with the Pringle Estate, the Town of Glenmora uses a portion of this property as a dump. The specific area which was considered as designated for the dump area was a large ditch or ravine on the Pringle property, which is approximately six to ten feet in depth, by a width of fifteen to twenty feet, and a length of two hundred to three hundred feet. There were other smaller ditches in the area where garbage was also dumped. A fence partially encloses part of this area. The dump is located approximately one-quarter mile southwest of Mr. Gassiott, Sr.'s home. Although the dump is customarily reached from the Pitkin Road which passes to the south of it, it is also accessible from the Melder Highway. From a point not far from Mr. Gassiott, Sr.'s home, a small winding dirt road extends from the Melder Highway southward for approximately one-half mile to the northern part of the dump. Photographs were introduced into evidence showing that trash was dumped where this road joins Melder Highway, and there are numerous trash piles scattered through the area along this dirt road.
A cow trail, which passes along the dirt road part of the way, extends in a southwest-northeast direction, and passes a pond of water near the dump area on beyond and to the north of Mr. Gassiott, Sr.'s home.
For some time prior to October 24, 1963, a bridge was out of condition and prevented access to the dump from the Pitkin Road, and the town garbage crew and others were using the entrance off the Melder Highway. On about October 24, 1963, one load of rubbish from the defendant's place of business was dumped along the dirt road about 225 yards to the northeast of the dump.
*173 Mr. Gassiott, Sr. testified that five cows failed to come in on the evening of October 24, 1963. On the next morning, he found one of these cows laying at the gate. He testified that when he opened the gate, the cow got up and staggered into the barn. The cow died about three hours later. Mr. Gassiott, Sr. walked up the cow trail and found a dead cow, and then called a veterinarian, Dr. John F. Jones, who practices in Alexandria, Louisiana. Dr. Jones made a temporary diagnosis that the cow died of poisoning. Later, three other dead cows were located, making a total of five. Three of the cows belonged to Mr. Gassiott, Sr., and two belonged to his son.
Mr. Gassiott, Sr. had seen a truck of the Town of Glenmora entering the road leading to the dump, and believing that possibly the town was responsible for the death of his cows, contacted the mayor of Glenmora, Ted Bartlett. The mayor and an employee of the town, Obie Howard, went with Mr. Gassiott to examine the piles of trash and rubbish hauled to the dump by the town. Nothing significant was found in these trash piles. These piles of rubbish were located north of the area designated as the dump, but nearer the ravine than the defendant's pile of rubbish. While investigating the area, the pile of rubbish dumped for the defendant was located. Evidence was found showing that cows had been rummaging through this trash pile. Some notebooks and bill heads with the defendant's name were found there, which were taken by Mr. Gassiott, Sr., and introduced into evidence at the trial of this case. Believing the trash pile might contain poison, Mr. Gassiott, Sr., and the mayor decided to burn the trash pile. They piled up trash, old cases, boxes and furniture located in the area, and used coal oil or gasoline to start the fire. Later, Mr. Gassiott, Sr., decided the burning was not safe, and covered the pile with dirt and debris about a foot deep.
Mr. Gassiott, Jr., who lives in Port Arthur, Texas, came to his father's home on the weekend, and they located the fifth cow on Sunday, October 27, 1963. Mr. Gassiott, Jr. dug through the dirt pile on top of defendant's trash pile and took several jars of samples from the ashes. No samples were taken except from this one pile of rubbish. These samples were taken for chemical analysis to Dr. Eads, Professor of Chemistry at Lamar State College of Technology in Beaumont, Texas. Dr. Eads found the samples to contain the presence of arsenic.
One of the dead cows was found at the gate of Mr. Gassiott, Sr.'s barnyard, which is about one-quarter of a mile northeast of the dump. Three other dead cows were found on the cow trail north of the Melder Highway, to the north of the Gassiott home, at points approximately one hundred, three hundred and six hundred yards from his barnyard. The fifth cow was found in the area of the dump, about two hundred fifty yards from the defendant's pile of rubbish.
The load hauled off from defendant's place of business consisted mainly of old feed sacks, hay and grain sweepings, tin cans, miscellaneous trash, and possibly some damaged canned goods. These items were accumulated over a period of time in cardboard boxes in the warehouse of the defendant, which is used for general storage and for the sale of roofing materials and livestock feeds. Mr. Gassiott, Sr. testified that the rubbish pile dumped by the defendant also contained old candy and cakes, as well as feed stuffs for cattle.
The defendant and his employee, Calvin Gordey, testified that the load of rubbish from his store was placed on top of an existing dump pile. The evidence shows that the defendant sold insecticides and weed killers which contained arsenic. Defendant's son and assistant manager testified that these poisons are not kept in the warehouse, but in the main store. He stated that he inspects all broken merchandise for the possibility of getting a price return, *174 and when there is damaged products in the pesticide section, he would not place these items in the usual trash, but would dispose of them immediately. He testified he would take this type of merchandise for his personal use at home.
Dr. John F. Jones testified that when he arrived at the Gassiott home, he found one cow dead and two sick, and he understood that two others were missing. He took blood samples from one of the sick animals and performed a complete autopsy of the dead cow. He noted that the cow showed an inflammation of the gastro elementary tract, and there were gross lesions internally, without any findings indicating an infectious process. For the purpose of having tests run, he took samples from the vital organs and from the contents of the rumen and abomasum of the cow. The samples were taken to the diagnostic laboratory at L.S.U.A. to be analyzed for heavy metal poisoning. He testified he thought the blood samples from the sick cow were also taken for testing, but he did not know what happened to these blood samples. He later received a report showing that the samples taken from the dead cow contained arsenic. In his opinion, based on the history of the sudden death of the cow, the positive findings of the test, and on his post-mortem examination, the cow on which he performed the autopsy died of arsenic poisoning.
Dr. Blake W. Blakewood, a veterinarian at L.S.U.A., is the director of the Central Louisiana Livestock Diagnostic Laboratory. He checked the samples received from Dr. Jones for arsenic and heavy metal poisoning. The tests showed there was more than a trace of arsenic present. He testified that there was a sufficient amount of arsenic present, if correlated with postmortem lesions, to have caused the death of the cow.
The district court felt that the circumstantial evidence presented by plaintiffs raised strong suspicions in favor of plaintiffs' contentions, but agreed with the contention of the defendant that the evidence merely presented a set of circumstantial possibilities, and did not establish with the definiteness and reasonable certainty required by law the basic elements of the case, to-wit: (1) that the sweepings and rubbish from the defendant's store and feedhouse contained arsenic; (2) that this arsenic was eaten by plaintiffs' cows; and (3) that all five cows died as a result of eating arsenic which came from defendant's store or feedhouse.
Considering the elements necessary to plaintiffs' case, the first question is whether or not there were any substances containing arsenic in the rubbish dumped from defendant's place of business. The evidence relating to the contents of this trash at the store certainly does not establish, but rather tends to negate, this element. Although the test made on the samples by Dr. Ead proved positive for arsenic, this is indecisive. Both the defendant and his employee testified the trash was dumped on an existing pile. Also, other rubbish was used to help burn the pile, which was later covered with dirt and debris. Mr. Gassiott, Jr. had to dig through this dirt to obtain his samples from the ashes. Evidence was presented that arsenic does not lose its character or potency over a period of years. Under these facts, arsenic found in the samples could have been contained within the older rubbish rather than that dumped from defendant's store.
The next element of plaintiffs' case is whether or not the plaintiffs' cows ate these substances which contained arsenic. In this connection, Dr. Jones testified that cattle will investigate garbage and foodstuffs, and would be attracted to sweet substances as candy, as well as feed and grain. There was evidence that cattle had rummaged through this pile. Although plaintiffs' cattle were in the general vicinity, and Mr. Gassiott, Sr. testified that he had not seen cattle belonging to others *175 in the area of his home during that period of time, there is no proof that those particular cows that died did, in fact, rummage through the defendant's rubbish pile. Mr. Gassiott, Sr. testified that the cows generally roamed over a large area, although they would normally not roam any further than a mile and a half. The closest cow was found about two hundred fifty yards away from defendant's rubbish pile, and the other four were located a considerable distance away, north of the Melder Highway. These cattle had access to a large area, including all of the area of the dump. Although plaintiffs looked around for the particular source of the poison, all of the area where rubbish was dumped was not investigated. We agree with the finding of the district court that defendant could not be responsible for the contents of each of the numerous dumpings in the area of the dump. Certainly other dumpings in the area could contain substances with arsenic. As indicated by the district judge, it is a matter of common knowledge that preparations containing arsenic, such as pesticides and weed killers, are readily available to the public. Also, there is evidence in the record that the Town of Glenmora sprayed the ditches of the town, and the Missouri Pacific Railroad Company sprayed its right-of-way with poison, although the specific chemical compounds were not identified. One witness testified that she found Mr. Gassiott, Sr.'s cows in her garden on the west side of Glenmora in October of 1963, and that she had used poison on her vegetables that very evening. Mr. Gassiott, Sr. testified that he also kept cattle to the west and south of Glenmora, but that the ones that died were kept in the area of his home and could not range to Glenmora because of fences.
The evidence in this case simply does not exclude other sources of arsenic poisoning to a reasonable degree of certainty.
The final question is whether all five cows died as a result of eating arsenic from defendant's pile of rubbish. Only one cow was tested for arsenic poisoning. There is no evidence as to the other four, except their sudden death under suspicious circumstances. One witness testified he dumped four bales of alfalfa hay that had molded in the area of the dump just a few days before the time of the death of plaintiffs' cows. This witness testified that he did not feed the hay to his horse because it would have killed it. Since the cattle of plaintiffs grazed through the area of the dump, the case presented by plaintiffs does not exclude other reasonable possibilities as to the cause of death of his five cows.
After carefully considering the evidence presented in this case, we agree with the district court that plaintiffs have not sustained the burden of proof.
In view of the foregoing conclusions, it is not necessary to discuss the other defenses raised by defendant.
By a preponderance of evidence is meant, simply, evidence which is of greater weight, or more convincing, than that which is offered in opposition to it; that is, evidence which as a whole shows that the fact or causation sought to be proved is more probable than not. Town of Slidell v. Temple, 246 La. 137, 164 So. 2d 276; Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395; Perkins v. Texas & New Orleans Railroad Company, 243 La. 829, 147 So.2d 646. This proof may be made not only by direct evidence, but also by circumstantial evidence which excludes other reasonable hypotheses "with a fair amount of certainty." Naquin v. Marquette Casualty Company, supra. According to our appreciation of the evidence in this case, we find that this burden of proof has not been met by plaintiffs in this case, and we find no manifest error in the conclusions reached by the district court.
*176 For the reasons assigned, the judgment of the district court is affirmed. All costs of appeal are assessed against plaintiffs.
Affirmed.