TATE, Judge.
The plaintiff Dupre sues to recover for damages to his clover crop. The loss was allegedly caused by the negligence of the defendant flying service (Roane), whom Dupre had engaged to spray his clover field to kill a certain alien weed. After trial, the District Court found that Roane had been negligent in the process of spraying herbicide on Dupre’s clover and that, but for this negligence, the clover would not have died. Accordingly, the plaintiff was awarded damages of $11,400 for the loss of his clover-seed crop.
Roane appeals, urging primarily that the trial court erred in inferring negligence through application of the “res ipsa loquitur” principle. Roane further argues that it has negatived its own negligence as the cause of Dupre’s crop loss.

Facts.

The plaintiff Dupre intended to raise a clover-seed crop for the 1963 season on his farmlands in Acadia Parish. Accordingly, *836 in September 1962 he planted a 95 acre field in clover. This clover had become a well-established crop some 4-6 inches high at the time of the weed-poisoning incident giving rise to his litigation.
Dupre’s clover crop became infested with dock weeds. He consulted the local county-agent (Firmin). This agricultural specialist recommended the application of 2-4-D 'in a salt amine formulation, which to his observation had worked well in actual use on other Acadia Parish lands.
Dupre retained the defendant Roane to apply by airplane the herbicide recommended by the county agent, instructing Roane’s manager to consult with Firmin as to the herbicide to be used. Although Roane’s manager did so, he and Roane’s president nevertheless also consulted with an LSU specialist, who (on their description of the problem) thought that 2-4-D in the stronger low volatile ester formulation might be more effective.
Roane’s employees therefore used the low volatile ester solution of 2-4-D rather than the salt amine formulation recommended by Firmin. (Dupre denies having approved this change. In our view, this issue is immaterial, since — as to be set forth below— it was not the stronger formulation which caused a crop loss but rather its improper application.)
Dupre’s field was sprayed about March 13th, 1963. Within 2-3 days the established clover plants commenced to wilt, within 4— 5 days the clover plants commenced to die and their leaves to fall off, and within about 3 weeks the entire clover crop was dead. (Surviving only was a patch along some trees, which the evidence suggests would not be affected by 2-4-D poisoning since a plane applying it would have pulled up to avoid the trees.) The pattern of dying found by the county agent was first in swathes consistent with the application from the wing-tips of the plane, where the strongest application would result.
Dupre’s testimony of the pattern and course of his crop’s dying was corroborated by the county agent and also by three farmers of the neighborhood. They also testified that no other clover or other crop in the immediate neighborhood had wilted or died during the March period in question. The testimony of these witnesses, reasonably accepted by the trial court as accurate, prove§ that neither the winter freezes nor a subsequent drought had caused any loss in Dupre’s clover crop or in the crops in Dupre’s immediate neighborhood.
We find no error in the trial court’s acceptance of such testimony preponderating over defendant’s evidence seeking to infer otherwise. Although in part contradictory of the plaintiff’s case, the defendant’s evidence mainly concerned the winter freezes which destroyed other clover crops (but undisputedly not Dupre’s) or the April-July drought conditions which adversely affected many (but not all) of the farmers of the parish after Dupre’s clover crop had already died.

The 2-4-D Flerbicide and the Expert T estimony.

Used in solution, the 2-4-D acid kills broad-leafed plants through its absorption into the root system and its disruption of the starch-conversion process by which plants live and grow. Different plants have different resistances to the herbicide. Generally speaking, application of a maximum óf one pound per acre in the low volatile ester solution (and of one and one-half pounds in the weaker salt amine formulation) should kill dock weeds but not other broad leaf plants of the area.
Clover is a broad-leaf plant, but it is more resistant to 2-4-D than most. Although Roane’s expert testified that 2-4 — D could never kill white clover, we regard the evidence as preponderating otherwise. Two other agricultural experts testified that, after observing Dupre’s dying or dead clover crop, they felt that the crop was *837 killed through application of an excessive amount of 2-4-D.
In a well-written and comprehensive opinion the trial court correctly summarized and weighed the lay and expert testimony. The defendant Roane astutely advances several suggestions of error based upon isolated excerpts from the reasons for judgment. Perhaps the simplest method to dispose of these contentions is just to quote the trial court’s analysis of the expert testimony and the court’s essential holding as to causation of the crop damage, as follows:
“ * * * Sam Firmin, County Agent * * * was recognized by the Court as an expert in the general field of agriculture. He indicated that he had worked with plaintiff on his farm since 1957, and that he advised plaintiff in his plans for raising clover. * * * He saw plaintiff’s clover field while it was growing, before and after the spraying, and testified that after the spraying the discoloration could be seen where the airplane streaks existed and that on the outer edges of the field the condition of the clover was not bad. He indicated that near trees and shelter where the clover was protected, same was not dying. He testified that the clover eventually died a few weeks after the spraying and that other fields in the area were green and thriving. He did indicate that there was a drought in plaintiff’s neighborhood but it was much later in the summer, after plaintiff’s clover died.
“On behalf of plaintiff the Court recognized Mr. W. E. Monroe, an Agronomist with the Louisiana State University Agricultural Extension Service as an expert in the field of agronomy with a specialty of pasture and forage crops. On behalf of the defendant the Court recognized Mr. Ernest R. Stemper, an Associate Professor at Louisiana State University in the Plant Pathology Department as an expert in the field of plant pathology with a specialty in herbicides. The expert Monroe had occasion to visit plaintiff’s clover crop, and concluded that if he were to express an opinion as to the cause of the demise of the clover he would say that it was caused by the use of too great an extent of low volatile ester with the 2-4-D. Mr. Stemper, who did not see plaintiff’s clover crop before or after, or at any time, generally defended the use of LV-40 [2-4 — D in ester solution] as being proper for use as a herbicide, but was generally inconclusive as to the cause of the demise of the clover and indicated it would be difficult for one to analyze this condition as occurred in this case unless one could actually view the field. * * *
“The Court is constrained to give greater weight to the testimony of Mr. Monroe, who viewed the dying clover crop and who opined, as an expert, that the clover was killed by an excessive use of the chemical, as compared to Mr. Stemper, who did not see the crop, and who, as aforesaid, was rather inconclusive as to the cause of the death of the clover.
“Of additional significance to the Court is its conclusion, that the usual herbicide mixture recommended by the L.S.U. Extension Service was 2-4-D in an amine preparation, which is what the Court concluded Mr. Firmin, the County Agent had experience with, and further that 2-4-D, in a low volatile ester, such as was used in this case, is usually only recommended in specific cases and then only in well-controlled maximum amounts per acre. Obviously, the use of the low volatile ester is more hazardous.
“The evidence clearly satisfies the Court that plaintiff’s clover crop died as the result of its contact with the chemical sprayed by defendant. Defendant has clearly failed to prove that the clover died because of drought. * * * ”

Proof of the Defendant’s Negligence.

Proof that Roane applied an excessive amount of poison is circumstantial. It is based on the consequences to the clover crop following the poisoning which (according to the preponderating evidence) would *838 mot have occurred unless the 2-4-D had hcen applied to clover in an excessive ratio.
Roane’s manager denies that an excessive amount of 2-4 — D was .applied. Not unnaturally and no doubt to the best of his belief, he testifies that he observed that Roane’s truck driver did not mismeasure the amount of 2 — 4—D added to the water for aerial application to the clover crop. Nevertheless, just as where a jam-smeared child denies a raid upon the jam jar, this denial may be regarded as overcome by circumstantial evidence of preponderating effect, see Sollberger v. Walcott, La.App. 1 Cir., 101 So.2d 483.
. Additionally, one of the plaintiff’s experts testified that it was not hard for an excessive ratio of 2-4-D poison to be added to the water when the herbicide is manually prepared for application. This could, he said, inadvertently result from any inaccuracy of imprecision in the calibration of the various measuring devices or from mismeasurement by the human agent. A relatively slight measurement error could result in an excessive application of the lethal 2-4-D ester solution. In fact, the expert testified, he himself had once killed a patch of clover because of such miscalibration when he was using 2-4-D poisoning at the LSU experimental station.
As summarized by us in Gassiott v. Gordey, La.App. 3 Cir., 182 So.2d 170, 175: "By a preponderance of evidence is meant, simply, evidence which is of greater weight, or more convincing, than that which is offered in opposition to it; that is, evidence which as a whole shows that the fact or causation sought to be proved is more probable than not. Town of Slidell v. Temple, 246 La. 137, 164 So.2d 276; Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395; Perkins v. Texas & New Orleans Railroad Company, 243 La. 829, 147 So.2d 646. This proof may be made not only by direct evidence, but also by circumstantial evidence which excludes other reasonable hypotheses ‘with a fair amount of certainty.’ Naquin v. Marquette Casualty Company, supra.”
Tested by these standards, we feel that— accepting the facts as found by the trial court, based upon its reasonable evaluation of the conflicting evidence — the plaintiff Dupre has proved by a preponderance of the evidence that the cause of his clover-crop loss was the improper use of excessive amounts of 2-4-D in the mixture applied by air by the defendant Roane. Resort to the principle of res ipsa loquitur to infer Roane’s negligence is therefore unnecessary. See Larkin v. State Farm Mutual Auto. Ins. Co., 233 La. 544, 97 So.2d 389, 392 (syllabus 3); Malone, Res Ipsa Loquitur and Proof by Inference, 4 La.L.Rev. 70 (1941).

Conclusion.

The evidence justifies the amount of award of the trial court for the damage caused to the plaintiff through the loss of his clover-seed crop because of the defendant’s negligent application of an excessive amount of 2^1 — D poison.
For the reasons assigned, the judgment of the District Court is affirmed at the cost of the defendant-appellant.
Affirmed.