Plaintiff, a Negro man aged sixty, alleging that he suffered physical injuries while riding on a bus owned and operated by Airline Motor Coaches, Incorporated, hereinafter called the bus company, instituted this suit against said company and its insurer, Highway Insurance Underwriters of Austin, Texas, to recover a large amount of damages. The below related facts are uncontradicted:
The bus company is authorized to and is engaged in the operation of a line of passenger motor busses in the States of Louisiana and Texas. It is, therefore, a common carrier.
Late in the afternoon of November 4, 1946, plaintiff and some friends boarded a bus of said company in the City of Shreveport, Louisiana, that was destined to pass through the places where they lived, south of the city, and paid to the motorman the required fares. As the bus proceeded southerly on Southern Avenue in said City, an automobile driven by Mrs. T.B. Wallace emerged from an intersecting street, going westerly, and in the effort to turn left on the Avenue, collided with the left side of the bus at and about its left front wheel. Both vehicles stopped instantly. The automobile was only slightly damaged. The wheel of the bus was so badly injured that when, a few minutes later, the motorman put the bus in motion, in an effort to remove it to the west curb of the street, the left wheel fell from the axle, allowing that corner of the bus to heavily descend to the pavement, a distance of some 18 inches. Mrs. Wallace, after the lapse of a few minutes, drove her car below the bus and parked it against the west curb of the Avenue. From this time on, the material facts of the case, in the main, are in serious dispute.
Plaintiff alleged that all seats on the bus were occupied when he boarded it and that he and several other passengers, on account of its overcrowded condition, were standing in the aisle when the accident occurred; that the motorman, after closing the bus door, following the collision, put the bus in gear and started it forward; that this movement caused the injured wheel to fall off and the axle's end to drop to the pavement; that the bus tilted so badly he was violently thrown upon and across the arm of one of the seats in front of him, his back and side striking the same, and that several of the standing passengers, having lost their balance, fell upon him; that as a result of these movements he received severe, painful and permanent injuries to his spine, vertebrae, etc. *Page 788 
The following acts of negligence are charged against the motorman, to-wit:
1. That the accident could and would have been averted had he been maintaining proper lookout;
2. That he operated the bus at an excessive rate of speed in view of its overcrowded condition;
3. That he tried to drive the bus forward without inspecting the wheel to ascertain if its condition warranted him in believing it was safe to do so without unloading all the passengers; that the wheel's injured and unsafe condition was obvious to any one who would have taken the pains to inspect same.
Defendants deny that plaintiff, if injured, as by him alleged, was injured because of the negligence of the bus company or its agent. They aver that the accident occurred solely through the negligence of Mrs. Wallace in that she failed to stop her car before endeavoring to cross Southern Avenue in front of the on-coming bus which enjoyed a superior right thereon under ordinance of the City of Shreveport. All other allegations of the plaintiff having to do with the injuries allegedly received by him, and the cause thereof, are denied.
The case was tried with intervention of a jury who rendered a verdict in plaintiff's favor for $6,145.00. From a judgment in keeping with the jury's verdict, the defendants appealed. Plaintiff, answering the appeal, prays for increase in the judgment.
[1] If plaintiff's case depended for its success upon injuries sustained by him as a direct result of the collision, clearly he would be without right to recover therefor. This conclusion is inevitable from undisputed facts. The collision is solely attributable to the negligence and carelessness of Mrs. Wallace. The bus enjoyed right of way on Southern Avenue. It was traveling at a lawful rate of speed when the Wallace car ran into it, and immediately prior. Mrs. Wallace attempted to cross the Avenue immediately behind a trolley bus that was going northerly and did not see the defendant's bus until it was too late to avoid colliding with it. These established facts exonerate the operator of the bus from any negligence whatever as a contributing factor to the original accident. Charges of negligence Nos. 1 and 2, above mentioned, are without merit.
The more serious phases of the controversy revolve around the alleged negligence of the motorman in trying to drive the bus forward when the left wheel was virtually in the act of falling off; and whether plaintiff was in the bus when the wheel did fall off.
The motorman is positive that immediately after the collision he turned around, faced the passengers, asked if any one was hurt and that plaintiff spoke up and said one of his feet had been injured. No other complaint was made. He is also positive that he at once accompanied plaintiff from the bus onto the sidewalk and then turned his attention to the Wallace car in which Mrs. Wallace's two small boys were crying, and that after talking to her a few minutes and being informed by her that neither she nor the boys were injured, he returned to the bus, put it in gear and went forward a few feet when the wheel fell off. He is also positive that plaintiff did not re-enter the bus. With respect to the motorman's knowledge of the injured wheel's condition, he testified as follows:
"Q. What did you see with regard to the bus and the car? A. I seen (sic) that the right front fender (of the car) was caved in and the left front wheel (of the bus) was kind of out of line a little bit. That looked like all that was wrong with it.
"Q. Could you tell the wheel would fall off? A. It didn't look like it would fall off.
"Q. Where were you going to drive to? A. I was going to pull as far as I could to the right."
Two white women, passengers on the bus, were as equally positive as was the motorman that plaintiff left the bus with the motorman immediately after the accident and did not re-enter it.
Four Negro men, friends of the plaintiff, on the bus at the time, are certain he remained aboard it until after the wheel fell *Page 789 
off. They testified that they saw him fall upon the arm of one of the seats and that three or more colored passengers who were standing in the aisle, lost their balance when the bus suddenly stopped and tilted, and fell upon him. One of these witnesses testified that he "rushed over and pulled the people off of him". All of these witnesses are also certain that not one passenger left the bus until after the doors were opened following the falling off of the wheel.
Mr. E.O. Daniel, Jr., member of the police force of the City of Shreveport, arrived at the scene of the accident a few moments after it occurred. Mrs. Wallace's car was then still beside the bus and the passengers had not left it. He is positive that the motorman told him that no one to that time had been allowed to leave the bus. He asked the motorman if any one was hurt and he replied: "Not to my knowledge". The bus door was then opened to allow the passengers to get off. The policeman further testified that at that time a colored boy "came up and told me that there was one of them (sic) colored boys back there was hurt". This officer then talked to the plaintiff who, he says, was aboard the bus and was told by him that his foot had been hurt by a suitcase falling from a rack. He also recalled, though not distinctly, that plaintiff mentioned that he fell down in the aisle. Plaintiff was asked by this officer if he wanted an ambulance called to carry him to the hospital, to which plaintiff answered in the negative. The officer then asked him if he was willing to go to the hospital, and receiving an affirmative reply, he made arrangements to have this done.
The morning after plaintiff reached the hospital he was found by the examining physician to be in intense pain that emanated from the region of the upper lumbar and lower dorsal spine. Plaintiff then complained also of pain in the left foot. Examination revealed an old tumer, of little significance, over the metatarsal bone.
Radiograph examination of the mentioned portions of the spine revealed the presence of old chronic hypertrophic arthritis that involved several of the vertebrae. Ankylosis was in advanced stages, which means that the vertebrae had grown together and had become rigid. These conditions, it is definitely shown by the medical testimony, required several years to come about.
Plaintiff remained in the hospital for eight consecutive weeks it is well established that an injury of the character he claims to have received while on the bus, could have aroused and activated the pre-existing dormant back pathology and produced the pain and disability of which he complains. While in the hospital plaintiff was fitted with a brace designed to support the back and alleviate the pain and discomfort from which he was suffering. He had continuously worn same to the day of trial.
[2] The resume of facts given above disclose diametrical disagreement between the witnesses of plaintiff and those of defendant as to whether plaintiff was on the bus when the wheel fell off. It is difficult to perceive how defendants' witnesses could be so woefully mistaken in their testimony on this question but such a conclusion is inescapable. It is certain plaintiff was not injured from the original collision, the impact which being so light it disturbed no one on the bus. It is equally certain he was injured between the time he boarded the bus and the time he alighted therefrom. The fact that it was thought necessary to send him to and he had to remain in a hospital for eight weeks argues convincingly that he was not shamming about being injured and this being true, surely he was injured at the time and place he and his witnesses assert.
The jury evidently shared this view of the testimony. Whatever else may be said on the subject, certainly there is no manifest error in the jury's resolution of this complicated factual issue.
The medical testimony is negative as to bone fractures or breaks. Evidently the fall upon the seat's arm and the weight of the passengers mashed and twisted, to some extent, the muscles, tissues, etc., about the affected vertebrae and disturbed the nerves of that region to the extent necessary to produce the pain and consequent disability of which plaintiff complains. The *Page 790 
medical testimony supports plaintiff's assertions of disability to perform hard work of any character. It is possible this degree of disability will be permanent, but it is not certain. We strongly incline to believe it will not be permanent. It is certain that the arthritis will endure.
Continuously, from time he was discharged from the hospital to the date of trial, some eleven months after the accident, plaintiff's wife, many times during the day, has had to iron his back with an electric iron.
The record clearly reveals that plaintiff was wholly ignorant of his spine being in the condition herein described. He had all of his adult life engaged in work that required the utmost physical exertion. He was never heard to complain of pain of any character in his back, prior to this accident. For some eighteen months, including all of the year 1945, he worked in a shipyard in Houston, Texas.
[3] Defendants do not controvert the contention that it was actionable negligence, under the prevailing circumstances and conditions, for the motorman to have attempted to drive the bus to any extent after having discovered the wheel was not in normal position. The fact that the wheel was to his knowledge out of line should have prompted him to make adequate examination to ascertain the full extent of injury thereto before proceeding further; and this knowledge, coupled with the fact that the bus was heavily loaded, demanded that he exercise the utmost care and caution for the protection of his passengers.
[4, 5] In a case of this character, based upon a breach of a contract of carriage, it is not necessary in order to make out a case of negligence to prove facts sufficient to constitute gross negligence. Slight negligence which, if omitted, would have prevented a breach of the contract, is all that is required by law. The highest degree of care and caution in such cases is required of the carrier, its agents and employees. This question was maturely considered and discussed in Wallace v. Shreveport Rys. Co., La. App., 175 So. 86, 88. An array of pertinent authorities is therein cited.
[6] Defendants assail the jury's award as being greatly excessive. They invoke the rule for assessing damages in a case of this character as laid down by the Supreme Court in Caldwell v. City of Shreveport, 150 La. 465, 90 So. 763, reflected from paragraph two of the syllabus, to-wit: "In a personal injury suit, evidence held to show that the traumatic injury was not the sole cause of, but merely superinduced, plaintiff's locomotor ataxia, the cause of which was a disease lurking in plaintiff's system at the time of the accident."
Pursuing this position, they argue that the injury to plaintiff's back simply super-induced, but did not cause, the pain, suffering and disability that followed; that these resultants are directly traceable to the pre-existing pathology of the spine which was activated and caused to flare up by the trauma.
In opposition to this position and contention, plaintiff cites and relies upon the contrary rule laid down in Lapleine v. Morgan's Louisiana Texas R. S. S. Co., 40 La. Ann. 661, 4 So. 875, 1 L.R.A. 378, to-wit: "The duty of care and of abstaining from the unlawful injury of another applies to the sick, the weak, the infirm, as fully as to the strong and healthy; and when the duty is violated, the measure of damages is the injury done, even though such injury might not have resulted but for the peculiar physical condition of the person injured, or may have been aggravated thereby."
The court in the Caldwell case made no reference whatever to the Lapleine case. In principle, the court in Cuneo v. Joseph Ariatti, Inc, 154 La. 609, 97 So. 878, followed the Caldwell case, but in Roth v. Russell, 141 La. 581, 582, 75 So. 418, the same court cited and followed the Lapleine case.
This court has uniformly followed the Caldwell case in cases wherein the rule laid down in that case was applicable. See Henderson v. The Louisiana Power Co., 9 La. App. 475, 121 So. 217; Price v. Florsheim, 13 La. App. 298, 127 So. 22; Wallace v. Shreveport Rys. Co., supra; Levy v. Indemnity Insurance Co. of North America, La. App., 8 So.2d 774; Robinsin v. Fossett, *Page 791 
La.App. 1947, 33 So.2d 546, in which a writ of review was denied by the Supreme Court on February 16, 1948.
We do not know whether the trial judge charged the jury specifically on this controverted question, and for this reason, we do not know whether the jury in arriving at its verdict took into consideration the fact of plaintiff's pre-existing back condition and made allowance therefor.
In the Caldwell case the court after having been convinced that the trial judge made no allowance for the pre-existing condition that afflicted plaintiff, which manifested itself after and because of the trauma, reduced the judgment by one-third. To justify this action, the court said: "Article1934 of the Civil Code declares that, in the assessment of damages arising ex delicto, much discretion must be left to the judge or jury. In fact, inasmuch as the same article declares that the assessment of damages in such cases may be made without calculating altogether on the pecuniary loss, the discretion that must be exercised is somewhat arbitrary. It appears that the district judge did not make allowance for the fact that plaintiff's infirmity was not all due to the accident. We have concluded, therefore, in the exercise of our discretion, to reduce the allowance for the personal injury from $3,000 to $2,000."
On the other hand, in Roth v. Russell, supra, 140 La. at page 586, 75 So. at page 419, the court made this very definite holding, to-wit: "But as plaintiff was in good health and strength at the time of the accident, the injury must be considered as the proximate, efficient cause of damage which set the other causes in motion, in the absence of evidence that the enlarged vertebra produced or aggravated the damage independently of the said injury. Lapleine v. Railway 
Steamship Co., 40 La. Ann. [661,] 665, 4 So. 875, 1 L.R.A. 378."
Plaintiff herein sued to recover for pain and suffering, loss of earnings and earning capacity, due to permanent injury to the spine, for cost of medicine, for physicians' bills and, lastly, for cost of the brace. He had a life expectancy of 14.1 years. He had earned very substantial wages for several years prior to the accident. Economic conditions, to some extent, account for this. There is nothing in the record, save the effects of the accident, to indicate that he would have been, from physical condition, prevented from rendering, in the future, services that would have yielded to him like remuneration.
In view of trial courts' uniform practice of following the latest decisions of superior courts on law questions, we feel warranted in assuming that the trial judge, in this case, in his charge to the jury, was governed by and followed the Caldwell case; that is, he charged the jury that in determining the amount of damages to which the plaintiff was entitled, it should take into account the pre-existing latent pathology that was aroused and activated by the trauma, and that the jury heeded the charge.
Therefore, for the reasons herein given, the judgment from which appealed, is affirmed with costs.