SARTAIN, Judge.
Appellants appeal from a judgment rendered against them in solido in the sum of $74,876.77, together with legal interest thereon from date of judicial demand until paid and for all costs, in favor of Elaine T. DeLaune, for personal injuries, medical expenses, property loss and loss of wages. These damages resulted from an automobile collision which occurred on May 22, 1961, at about 4:30 p. m. o’clock in the City of Baton Rouge on the Scenic Highway at Ontario Street.
Following the accident and before the date of the trial, defendant, Marquette Casualty Company, was placed in rehabilitation and all proceedings against it were stayed by order of the 19th Judicial District Court. LSA-R.S. 22:734.
The remaining defendants are Charles J. Lousteau, principal of Brusly High School, Brusly, Louisiana; and, his employer, West Baton Rouge Parish School Board. The suit was authorized against the latter by House Concurrent Resolution No. 82 of the 1962 Regular Session of the Louisiana Legislature. They contend that the accident was occasioned by the acts of negligence of plaintiff and an unknown female driver designated as “Jane Doe”; or, in the alternative, if there is any negligence on the part of Lousteau, plaintiff’s right to recover is barred by her contributory negligence. Plaintiff asks that the district court’s decision be affirmed.
The evidence shows that at the scene of the accident Scenic Highway is a four lane thoroughfare running generally north and south. Ontario Street is a two lane street and joins Scenic Highway at right angles on the west side. This may also be described as a “T” intersection for Ontario Street does not continue beyond Scenic Highway on the east side. The north and south lanes of Scenic Highway are divided by a slightly raised strip. There is an opening in this center strip so that traffic on Ontario Street traveling in an easterly direction may cross the southbound lanes of Scenic Highway and then turn left to proceed north. Scenic Highway is given the right of way at this intersection as there is a stop sign facing traffic on Ontario as it enters Scenic Highway.
Plaintiff, who is a research chemist employed by Humble Oil & Refining Company in Baton Rouge, testified that she left her place of employment at approximately 4:15 p. m. o’clock, that at the intersection of Scenic Highway and Mohican Street, which is opposite the main gate at the Humble plant, she drove her car into the inside southbound traffic lane of Scenic Highway and had continued in this lane approximately nine blocks when the accident occurred. She further testified that as she was approaching Ontario Street, there was a line of cars stopped in the outside southbound traffic lane of Scenic Highway extending northward from the intersection of Chippewa Street and Scenic Highway, which is one block south of Ontario Street, to approximately one block north of Ontario Street. She reduced the speed of her automobile so as to proceed at a rate of twenty or thirty miles an hour. She stated she took this precautionary measure so that in the event one of the drivers in the outside lane would decide to pull into the inside lane in front of her she could avoid an accident. The inside lane was comparatively free of cars, there being only one vehicle in that lane preceding plaintiff by approximately one block.
Plaintiff further stated that when she was approximately a half a block north of Ontario Street, she noticed that an opening or gap had been left in the line of stopped cars in the outside southbound lane of *909 Scenic Highway at Ontario Street. She surmised that this was to enable traffic from Ontario Street to make a right turn to proceed south in the outside lane of Scenic Highway. She explained: “I didn’t conceive of anyone making a left-hand turn into Scenic Highway with that amount of traffic — going through four lanes of traffic. And the next thing I knew there was a car in my lane and I hit it.” When she reached a point very close to Ontario Street and while still traveling in the inside southbound lane of Scenic Highway, the front of Mr. Lousteau’s car suddenly appeared before her resulting in an immediate collision.
Defendant, Mr. Lousteau, testified that as he approached Scenic Highway in an easterly direction on Ontario Street he stopped for the stop sign. He intended to cross the southbound lanes of Scenic Highway and make a left turn so as to proceed north on Scenic Highway toward the Mississippi River Bridge. He noticed that the traffic on Scenic Highway was very heavy and also that there was a line of cars in the outside southbound lane thereof hacked up from the traffic light at Chippewa, one block south on Ontario, to a point north of Ontario Street. A woman driver (the “Jane Doe” hereinabove referred to) in this line of cars brought her car to a stop in such a manner as to leave a space between herself and the car immediately in front of her. She then motioned to Mr. Lousteau to enter Scenic Highway. Relying entirely on her signal and without attempting to ascertain if there was any traffic in the outside southbound lane of Scenic Highway, he proceeded to cross the southbound lanes, to make a left turn and proceed north. He testified that he was crossing right in front of the woman who motioned him out. He did not see plaintiff’s car until after the accident had occurred. He estimated his speed at the moment of collision as between 10 to 15 miles per hour.
The point of collision was fixed by the police officers who investigated the accident at a point 10}4 feet east of the west curb of Scenic Highway, and 914 feet west of the center dividing “hump” of Scenic Highway. This testimony corroborates that of the plaintiff’s when she stated that the Lousteau car was right upon her when it made its first appearance.
In his reasons for judgment as to the negligence of defendant, Lousteau, the trial judge stated-:
“It is not often that the issues of liability in an automobile collision suit are as clearly defined as they are in the instant case. There can be no question but that Mr. Lousteau was guilty of gross negligence in entering a major, heavily-traveled thoroughfare which enjoyed a superior right-of-way, with his vision to his left completely obscured, with utter inattention on his part to motorists approaching from that direction and with no concern whatever for traffic proceeding northward in the two northbound traffic lanes of Scenic Highway.
“The rule is well settled to the effect that a motorist who merely stops before attempting to enter a right-of-way thoroughfare has only performed one-half the duty resting upon him. To stop and then proceed without ascertaining if it is safe to do so is negligence of a gross character and renders such driver guilty of negligence. Likewise, it has been held in many cases that a motorist intending to execute a left turn in an intersection must initially ascertain by careful observation that the maneuver can be executed safely. Dyck v. Maddry, et al, 81 So.2d 165 ([La.App.] C.A. 2nd Cir.), and cases therein cited.
******
“As the defendant Lousteau entered the intersection with the intention of making a left turn, he did not ascertain by careful observation that that maneuver could be executed safely. In fact, by his own admission, he made no observation whatever, his mind focusing completely upon the kindness and courtesy of the woman driver who beckoned him to enter the highway.”
*910 The evidence in this case clearly establishes that the defendant, Lousteau, was negligent in proceeding across Scenic Highway and that this negligence was the sole and proximate cause of the accident. We have purposely deleted from the above quotation that portion where the trial judge further concluded that Lousteau’s action constituted criminal negligence. Considering all of the facts and circumstances surrounding the accident, such a severe verdict is not warranted.
The trial judge’s discharge of plaintiff of any contributory negligence is fully supported by the evidence herein and the jurisprudence of this state. Plaintiff was traveling at a very moderate rate of speed and had her car under complete control. The right front of her automobile collided with the left front of the Lousteau vehicle. Lousteau admitted that he did not look towards her direction and proceeded out from Ontario Street at 10 to 15 miles per hour. He had only gone 10 to 15 feet at the most when the accident occurred, just inside plaintiff’s lane of traffic. Plaintiff could only have been two or three car lengths away when he started to cross her lane of traffic. Assuming arguendo, that she saw the Lousteau automobile through the windows, rear windows and windshields of the cars stopped in the outside lane of Scenic Highway, as urged by appellants, she had every right to expect that he would remain stopped and in a safe position. It is also clear from the record that Lousteau commenced his move at a time when plaintiff was helpless to prevent the accident even if she had seen the Lousteau vehicle. (See Hunter v. United Services Automobile Association et al., La.App., 129 So.2d 908; Guarisco v. Swindle et al., La.App., 132 So.2d 635; Kugler v. Thomas, La.App., 101 So.2d 729.)
We next consider the liability of West Baton Rouge Parish School Board. On the day of the accident, Mr. Lousteau was employed by the Board in the capacity of a teacher and as principal of Brusly High School, Brusly, Louisiana. At the time of the accident, he was returning to Brusly from a trip to the State Department of Education in Baton Rouge. The sole purpose of this trip was to deliver to the Department transcripts of the grades of the graduating seniors of his school and to receive diplomas for their graduation, which was to take place the next day. He proceeded directly to the Department for this purpose and was on his return trip, via Scenic Highway and the Mississippi River Bridge when the accident occurred. He made one stop and that at Hopper’s Drive-In, a soft drink establishment, located on the southwest corner of the intersection where the accident occurred. The rule of respondeat superior, found in Articles 2317 and 2320, R.C.C., is clearly applicable here. The accident occurred at a time when Lousteau was acting within the scope of his employment and in furtherance of his principal’s interest. Benoit v. Hunt Tool Company, 219 La. 380, 53 So.2d 137; Romero v. Hogue, La.App., 77 So.2d 74; Travelers Fire Insurance Company v. Savoy, La.App., 82 So.2d 68. Nor was Lousteau’s stop at Hopper’s, which is located on his direct route, for the purpose of obtaining soft drink refreshment, such a deviation from his employer’s business as to render the doctrine of respondeat superior inapplicable. Autenreath v. Southern Mercantile Company, La.App., 81 So.2d 168; Bonstaff v. Hawkins, La.App., 30 So.2d 781.
We now turn our attention to the injuries sustained by plaintiff and damages awarded her therefor. Immediately following the accident she saw her family physician, Dr. John T. Lewis. Dr. Lewis found obvious muscle spasms and referred her to a radiologist for x-rays. After he reviewed the x-rays, he made a diagnosis of sprain of cervical and thoracic area muscles. It was his opinion that the condition which he found to exist in plaintiff’s neck and shoulders was the result of the accident. He was also of the opinion that plaintiff’s condition warranted treatment by a specialist and referred her to Dr. Duane Forman, *911 a specialist in neurology and neurological surgery. Dr. Lewis had nothing further to do with plaintiffs subsequent medical treatment,,except to assist Dr. Forman during surgery which was performed on September 18, 1961.
Dr. Forman first saw plaintiff on June 9, 1961. On that day he found her suffering from spasms and tenderness of the posterior cervical and upper shoulder girdle muscles and limitation of motion in the cervical spine. He was of the opinion that the accident of May 22, 1961 was responsible for this condition and made the diagnosis of sprain of the cervical spine. When he next saw plaintiff on June 20, 1961, she had began to develop pain with numbness in the upper extremities and presented additional symptoms indicating compression of the fifth and sixth cervical nerve roots. He had her admitted to Our Lady of the Lake Hospital on July ‘4, 1961, where she remained until July 12, 1961, during which time she was treated by traction and muscle relaxants. Thereafter, plaintiffs symptoms persisted in severity and also showed signs of compression of the seventh cervical nerve root. On July 19, 1961, plaintiff was again admitted to the hospital and Dr. For-man performed myelography which revealed cervical spondylosis at the C-S and C-6 disc levels, with questionable changes at the C-7 disc. Myelography is a procedure whereby radio-opaque dye is inj ected into the spinal canal by means of a spinal puncture in the lower back and the dye is allowed to migrate toward the top of the spine enabling the physican to study the spinal canal.
Dr. Forman believing plaintiff’s problem to be primarily of an orthopedic nature referred her to Dr. George C. Battalora, an orthopedic surgeon practicing in New Orleans. Dr. Battalora examined plaintiff on July 27, 1961, and like Dr. Forman diagnosed her injuries as a strain of the cervical spine. He first prescribed a four-point cervical brace. When he saw plaintiff on August 17, 1961, he additionally prescribed alternate cervical traction. On September 13, 1961, when plaintiff was next seen by Dr. Battalora, she complained of radiation of pain into her left arm and middle fingers of both hands. He further observed on this occasion that she had developed a loss of reflex in her right' arm, indicative of nerve root irritation and advised laminectomy. He was of the opinion that the spondylosis pre-existing in plaintiff’s neck was aggravated by the trauma of the accident, that whereas such condition was asymptomatic before, the accident made it symptomatic.
On September 18, 1961, Dr. Forman performed cervical laminectomy on plaintiff. He described the operation for the benefit of the trial court and counsel with the use of an anatomical model of the cervical spine. An incision of approximately seven to eight inches in length was made along the midline of plaintiff’s neck to expose the spinal cord as high as the fourth in-tervertebral disc and as low as the seventh intervertebral disc. The muscles from the vertebrae were pushed aside in order to expose the bony arches forming the back portion of the vertebrae. He then removed the bony arches, known as laminae, at C-4, C-5, C-6 and C-7. The purpose of the operation was to decompress the spinal cord and nerve roots and thereby relieve plaintiff of her severe persisting pain which conservative treatment previously administered had failed to accomplish. It is considered a delicate operation and is performed in close proximity to the spinal cord and nerve roots which innervate the rest of the body below that level and the upper extremities respectively. Following the operation, plaintiff suffered from considerable numbness and weakness in her upper extremites. Dr. Forman attributed this to the bruising of the nerve roots during the operation. She also developed a clot in the lower part of the wound which had to be evacuated under local anesthesia on October 2, 1961 and the wound resutured. She remained in the hospital on this occasion for 26 days. Plaintiff gradually recovered back to her preoperative status. However, she derived little if any benefit *912 from the operation. Four or five months after the operation, plaintiff began to show intermittent aggravation of her previous nerve root symptoms of pain and numbness, described by Dr. Forman as spasm of her scalene muscles on each side. Eventually these muscle spasms subsided. She did, however, continue to have pain in her neck, upper shoulder girdle region, with nerve root pain and paraplegia.
Dr. Forman testified that throughout the time he treated plaintiff she had been experiencing a great deal of pain, that it was necessary to maintain her under supervised but nevertheless extensive management of pain killing drugs. At the time of the trial, two years after the accident, she was taking one or two tablets of Leritine once or twice a day. Leritine is a fairly strong synthetic narcotic which can be habit forming.
Dr. Forman was further of the opinion that plaintiff’s condition would worsen and that additional surgery would ultimately have to be done on her cervical spine. The surgery indicated is foraminotomy. This operative procedure would involve the removal of additional bone, particularly, the. interpedicular joints of the C-6 and C-7 cervical vertebrae. It was the advice of all specialists that this operation should be undertaken as a last resort and then only if the pain became so unbearable plaintiff would be left with no other alternative. Dr. Forman felt that such indications were already present in plaintiff’s condition.
The trial judge was undoubtedly impressed with the efforts made by plaintiff in seeking the very best medical services available. The record fully supports this conclusion. Among other physicians seen by her were Drs. Stander, Morris, Byrd and Sabatier of Baton Rouge; Drs. Soniat and Echols of Oschner Clinic in New Orleans; and finally, Dr. Garcia Oiler of New Orleans, a specialist in the field of neurological surgery.
Defendants strenuously urge that plaintiff’s condition is due primarily to a preexisting progressive degenerative condition of her spine known as spondylosis, and that the accident either was not responsible for her symptoms or, if it was, such symptoms would have occurred sooner or later, regardless of the accident. Spondylosis is the diminution of space between the vertebrae occasioned by the drying up to some extent of the disc structures. The severity of the condition, of course, depends on the degree of reduction in space between the vertebrae. The trial judge found that this contention by defendants was “definitely contradicted by the testimony of all three outstanding neurological experts who testified in this case, all of whom were in agreement that spondylosis in itself seldom gives a person any difficulty and that Miss De-Laune could have remained asymptomatic during the rest of her life if she had not been injured in the accident.” This conclusion is fully supported by the evidence, which in our opinion leaves no doubt that plaintiff’s condition of spondylosis, which was asymptomatic prior to the accident, was made symptomatic by the accident.
Admittedly, much of plaintiff’s complaints and disability are the result of nerve root involvement occasioned by the laminec-tomy. However, the unalterable fact remains that the laminectomy was necessitated by the trauma of the accident. The-burden of showing this has been satisfactorily borne by plaintiff. Now as a defense-to the damages awarded for such injuries-defendants assert that these injuries are-basically the result of a pre-existing condition. Accordingly, the burden rests with them to show that such is the case here. The trial judge concluded that the defendants had failed to satisfy this burden and1 with this conclusion we concur.
The rule of law applicable here was recently stated by us in Smith v. New York Fire & Marine Underwriters, La.App., 182 So.2d 741, wherein we quoted from Williams v. Reinhart, La.App., 155 So.2d 51, the following:
“ ‘The duty of care and of abstaining from injuring another is due to the weak, *913 the sick, the infirm, equally with the healthy and the strong, and when that duty is violated the measure of damages is the injury inflicted, even though that injury might have been aggravated or might not have happened at all, but for the peculiar physical condition of the person injured. See Lapleine v. Morgan’s Louisiana & Texas R. & S. S. Co., 40 La.Ann. 661, 4 So. 875, 1 L.R.A. 378; Walker v. Joseph P. Geddes Funeral Service, Inc., La.App., 33 So.2d 570; Brooks v. Airline Motor Coaches, Inc., La.App., 35 So.2d 786; Trascher v. Eagle Indemnity Company of New York et al., La.App., 48 So.2d 695; Payton v. Great American Indemnity Co. et al., La.App., 83 So.2d 575.’ ”
Plaintiff, who was forty-six years of age at the time of the accident, had, two years later at the time of the trial, been employed by Humble Oil & Refining Company, Baton Rouge, for twenty and one-half years, the last ten in the capacity as a research chemist. In this capacity she is required to use both hands, make accurate and fine weighings of chemicals, some of which are dangerous. Her work necessitates the use of instruments and the handling of all sizes of chemical flasks and containers. Her ability to perform her routine tasks has been seriously impaired by loss of strength in her left arm and pain. She must now concentrate on and focus her attention to the simple act of holding an object in her left hand. Dr. Oiler testified that there was a definite loss of function of this arm resulting in a severe handicap to plaintiff. “In other words, one cannot do any automatic function, handle machinery or grasp any object, or do anything that requires strength.” He further stated that if plaintiff were not a specialist in a scientific field like chemistry, she would be totally disabled from making a living from a physical standpoint. On his advice, plaintiff has constantly worn the neck brace since August of 1962, taking it off only to retire at night. It was his opinion that a similar trauma now to plaintiff’s neck while unprotected by the brace could prove fatal. Also, since August of 1962, plaintiff has undertaken physical therapy at Our Lady of the Lake Hospital three times per week.
Considering the above, we quote at length and with approval from the trial judge’s written reasons:
“By way of summary, it is the opinion of the Court that plaintiff has shown by a fair preponderance of the evidence that as a result of the accident herein sued upon she has had her physical well-being very seriously impaired. Her life has been replete. with constant and severe physical pain; with anguish and mental suffering over the outcome of drastic operative procedures which have been performed upon her and which might yet have to be performed; with anxiety over her ability to continue the duties of her occupation and her ability to lead a normal life. She has had the annoyance and discomfort of the constant wearing of a clumsy, unsightly neck brace; the annoyance of not being able to control the movements of her left arm, and the frustration of seeing objects fall from her grasp. She has been relegated to a constant use of drugs and suffers the additional torment over the possibility of drug addiction. Her view of the future is dim and most discouraging. The doctors agree that her condition will grow progressively worse, and that another drastic operative procedure, whose results can by no means be assured, may have^ to be performed upon her. Although the doctors may possibly be wrong, the most likely prospect is that plaintiff will soon spend the rest of her life as an invalid.
“As our Courts have said many times, monetary recompence (sic) seems very inadequate when contemplating severe suffering by litigants, still that is the only recompense available to this plaintiff. The awards made in this case will enable the plaintiff to provide herself with some measure of comfort such as *914 would make the rest of her life a little more hearable. She is claiming the sum of $25,000.00 for pain and mental anguish suffered by her and $25,000.00 for her permanent disability resulting from this accident. This Court feels that these figures under the facts of this case are conservative and reasonable. She has asked for the sum of $6,000.00 for estimated future medical expenses, and, in view of the testimony, that the foram-inotomy which may ultimately have to be performed may alone cost $2,500.00 in surgical fees, plus at least as much in hospital expenses as had been incurred in connection with the laminectomy ($818.33 hospital bill, plus $928.00 for special nurses) ; in view, further of the continuing physio-therapy which to date has cost plaintiff $545.50, and the continued use of drugs which up to the present time have cost plaintiff $365.92, this figure seems to be very fair and reasonable.
“Plaintiff is also asserting a claim for $10,000.00 for estimated future loss of earnings. In the light of the medical testimony in this case, it is highly doubtful that plaintiff will be able to continue in her occupation for any considerable time. She is earning $775.00 per month, or $9,300.00 a year. The figure prayed for is only slightly in excess of one year’s income. It is quite probable she may lose many more years of her income. The Court feels that this item of damages is very reasonable.
“Finally, plaintiff is seeking $3,500.00 for loss of sick leave pay. She testified that, after an absence of six months from her work, she is placed on half-pay and, in line with the foregoing reasoning, it is easily seen how at least such amount of sick leave pay could be lost by the plaintiff. The Court feels that this amount is reasonable and fair.
“There is no dispute as to the amount of $4,784.11 for medical bills, there being a stipulation as to this amount in the record, nor as to the property damage loss involving plaintiff’s automobile, amounting to $592.00.
“The above demands total $74,876.77, and this Court for the reasons assigned herein, renders judgment in that amount in favor of plaintiff, Elaine T. DeLaune, and against the defendants, Charles J. Lousteau and West Baton Rouge Parish School Board, in solido, together with legal interest thereon from the date of judicial demand until paid and for all costs.”
Lastly, defendants urge that the ability of Lousteau to respond to judgment be considered by us and that the damages awarded herein be reduced proportionately. They argue that the West Baton Rouge Parish School Board, as master, has the right to proceed against Lousteau, their agent. This, of course, they have the right to do and ultimately this may prove to be an eventuality. Nevertheless, it cannot stand in mitigation of the School Board’s ultimate responsibility, as the employer of Lousteau, to an innocent third party. An employer’s responsibility for the torts of an employee is authorized by LSA-C.C. Article 176 and Article 2320, This responsibility is not necessarily in solido with that of the employee. Williams v. Marionneaux, 240 La. 713, 124 So.2d 919. The employer may be sued separately as he is just as liable as if he had personally inflicted the hurt. LSA-C.C. Articles 2317, 2320, and Little v. Caterpillar Tractor Company, La.App., 169 So.2d 654.
For the above and foregoing reasons the judgment of the trial court is affirmed at appellants’ costs, subject to the limitations of LSA-R.S. 13:4521 as to defendant, West Baton Rouge Parish School Board.
Affirmed.