210 So.2d 528 (1968)
David SPIZER, Individually and for the Use and Benefit and on Behalf of his minor daughter, Dale Ann Spizer
v.
DIXIE BREWING CO., Inc., and United States Fidelity and Guaranty Company.
No. 2859.
Court of Appeal of Louisiana, Fourth Circuit.
May 15, 1968.
*529 Kierr & Gainsburgh, Raymond H. Kierr, New Orleans, for plaintiff-appellee-appellant, J. D. Dresner, Harvey J. Lewis, New Orleans, of counsel.
Sessions, Fishman, Rosenson, Snellings & Boisfontaine, Curtis R. Boisfontaine, New Orleans, for defendants-appellants, Arthur A. De La Houssaye, New Orleans, of counsel.
Before REGAN, SAMUEL and JANVIER, JJ.

ON MOTION TO DISMISS ANSWER TO APPEAL AND ON MERITS
SAMUEL, Judge.
Individually and in his capacity as administrator of the estate of his minor daughter, Dale Ann Spizer, plaintiff instituted this suit for injuries sustained by the minor and expenses incurred by him as a result of an automobile-truck collision. Subsequent to this appeal the minor was emancipated by notarial act and, by order of this court, was substituted as a party plaintiff in the place and stead of her father insofar as he appears on her behalf. Defendants are Dixie Brewing Company, Inc., the owner of the truck involved in the accident, which vehicle was being operated by a Dixie employee in the course of his employment, and United States Fidelity & Guaranty Company, Dixie's liability insurer.
Defendants stipulated liability and the matter was tried to a jury which rendered a verdict in the sum of $150,000 for the minor's injuries and $7,779 for plaintiff individually. The verdict was made the judgment of the court on February 3, 1967. Defendants then filed a motion for a new trial and the trial judge, being of the opinion the damages awarded for the minor's injuries were excessive, ordered that the verdict and judgment be set aside and a new trial granted unless, within 10 days, plaintiff consented to a reduction of the $150,000 award to the sum of $75,000, in which event the motion for a new trial would be denied.
Plaintiff filed a consent to the remittitur (see LSA-C.C.P. Art. 1813) pursuant *530 to the conditions imposed by the court stating he did so "in order to avoid a new trial or other further litigation" and reserving his right to answer any appeal the defendants might take in order to seek an increase in the reduced award. Thereafter, on March 20, 1967, judgment was rendered denying the motion for a new trial and amending the prior judgment so as to change only the award for the minor's injuries, that award being reduced from $150,000 to $75,000.
Defendants have prosecuted this appeal from the judgment of March 20, 1967, contending both the awards for the minor's injuries and for special damages are excessive and should be reduced. Plaintiff answered the appeal praying: (1) that the judgment of March 20, 1967 be set aside and the verdict and judgment of February 3, 1967 be reinstated; or alternatively, (2) that the judgment of March 20, 1967 be amended by increasing the award for the minor's injuries from $75,000 to $125,000. Defendants then filed a motion to dismiss plaintiff's answer to the appeal. We will consider the issues, defendants' motion to dismiss the answer to their appeal and quantum, in that order.
The motion to dismiss is based on the argument that plaintiff's consent to a reduction of the award in favor of the minor constitutes a voluntary and unconditional acquiescence in that reduction, which effectively prevented defendant from obtaining a new trial, and plaintiffs therefore have no right to seek an increase in the award by appeal or by answer to defendant's appeal under LSA-C.C.P. Arts. 2085 and 2133. Noting that the question presented is not one involving a party who has been awarded damages, consents to a remittitur and then attempts to appeal from the judgment resulting from such consent, we are of the opinion the motion to dismiss must be denied.
In pertinent part LSA-C.C.P. Arts. 2133 and 2085 provide that an appellee's answer to an appeal "* * * shall be equivalent to an appeal on his part * *" and that an appeal cannot be taken by a party "who voluntarily and unconditionally acquiesced in a judgment rendered against him. * * *" But, aside from the question of whether the judgment in the instant case is one "against" the appellee within the intent and meaning of Article 2085, our firmly settled jurisprudence is that, in order to lose the right of appeal by acquiescence, such acquiescence must be voluntary, unconditional, absolute and accompanied by the intention to acquiesce and abandon the right to appeal. Succession of Franz, 238 La. 608, 116 So.2d 267; Scott v. Scott, 218 La. 211, 48 So.2d 899; Meyers, Whitty & Hodge, Inc. v. Popich Marine Const., Inc., La.App., 143 So.2d 739; Zeringue v. Administrator, Division of Employment Sec., Dept. of Labor, La.App., 127 So.2d 91.
Here, under the threat of a new trial if he did not accept the remittitur, plaintiff consented to a reduction in the damages awarded by the jury only to avoid the expense, delay and uncertainty of a new trial or an appeal; there was no intention of abandoning, in fact he specifically reserved, his right to answer a defendant appeal in order to seek an increase in the reduced award. This is not the voluntary and unconditional acquiescence contemplated by Article 2085.
Clearly it would be inequitable to allow the defendants to seek a further reduction of the award by appeal and at the same time deny plaintiffs the equivalent right of seeking an increase by way of answer to that appeal. See Plesko v. City of Milwaukee, 19 Wis.2d 210, 120 N.W. 130, 16 A.L.R.3d 1315. This is especially true in Louisiana (it appears to be the minority view in the common law states) where the effect of the denial of a new trial is less disadvantageous to either litigant than it is in many other jurisdictions. For in this state the appellate courts review both the law and the facts and, upon proper showing, have the authority to grant greater or lesser awards than did the trial judge or jury.
*531 At the time of the accident Miss Spizer was a very attractive 17 year old high school senior. Her principal physical injuries incurred in the accident were to the eye, the face, the teeth and the nervous system. She also sustained a fractured clavicle and other less serious injuries including a laceration of the ear. She was required to undergo, and continues to receive, psychiatric treatment. At the time of trial, two years after the accident, she had been seen by more than twenty physicians, received treatment from a substantial number of that group and, in addition to the initial operation mentioned in the next paragraph, had undergone numerous surgical procedures including three operations under general anesthesia.
Miss Spizer was found unconscious after the accident and rushed to a hospital where an operation of several hours duration was performed by Dr. Richardson, a neurosurgeon, and Dr. Vincent, a plastic surgeon. She had at least four fractures in the facial area, several of which were either sutured or wired, and a fracture of the clavicle. Almost one inch of bone was missing in the lower rim of the eye orbit which supports the eye and that eye had descended into the sinus or inner cavity of the face. The eye is now supported by a piece of molded silicon rubber which was wired into place below the eyeball and replaces the lost bony structure. The principal laceration began on the right upper eyelid below the eyebrow and descended down toward the nose, through the inner canthus (the inner angle of the eye), to the outside angle of the mouth. The muscles holding up the lip had been cut and the nerve supplying the upper lip was damaged. While in the hospital following surgery she developed cardiac arythmia (improper heartbeat rhythm). She suffered a loss of memory of events which occurred on the day preceding the accident and recalls nothing for several days thereafter. Dr. Garcia-Oller, a neurosurgeon, termed this loss of memory pretraumatic amnesia, neurologically indicative of a moderately severe brain injury. Her neurological injuries were a contusion and bruising of the temporal lobe of the brain.
When the bandages were removed there was a lag or lack of full movement of the muscles on the right side of the face, resulting in an obvious difference in the use of those muscles. The series of complex muscles which produce a natural smile were all cut. Because of excellent surgery and good physiotherapy consisting of 17 electrical stimulations of the face, the muscles were approximated and she has regained partial use thereof. She has had a partial return of sensation of the upper lip on the right side but this sensation is abnormal. Dr. Garcia-Oller stated a nerve which has been damaged and scarred can be a source of pain in that part of the face in later life due to scar tissue. As a result of nerve damage the side of Miss Spizer's face is very sensitive due to irritation of the skin and her upper lip has a feeling of coldness or numbness commencing at the middle and extending to the right side. At the time of trial she had passed maximum recovery and these residuals will remain and perhaps increase.
Miss Spizer was readmitted to the hospital on three occasions for further plastic surgery for excision and revision of facial scars to try to improve them. In addition, a surgical procedure was performed in Dr. Vincent's office when one of the scars was injected with kenalog, a substance used to flatten out elevated scars. On at least one occasion Dr. Vincent removed glass from her face. Although the maximum cosmetic restorations have been made, she still has obvious scars on the right side of her face above the angle of the lower part of the jaw. Her cosmetic condition at the time of trial is the end result of impressive medical procedures and care. But she has obvious facial scarring, there is a difference between the two sides of her face with less expression on the right side and, due to scar tissue and some nonfunctioning muscles, when she attempts to smile her lower lip does not elevate as high on the right side as on the left.
*532 The eye injuries also are serious. The conjunctival sac, which tube drains the tears from the socket, was split for a distance of 3-4 millimeters. This causes profuse tearing from the right eye. She has diplopia (double vision) of the right eye caused by scar tissue from bleeding and trauma around the eye muscles. In the opinion of Dr. Wm. Clark, ophthalmologist, she will not be able to overcome this although she can compensate somewhat by tilting the head. She has an epicanthus fold over the left eye unavoidably due to suturing of the lid. While this has been partially repaired by plastic surgery, the scar is still there. Dr. Clark found a portion of the optic nerve behind the eye was dead. From the combined findings of Dr. Clark and Dr. Shelley Gaines, also an ophthalmologist, it appears she has a 2 muscle imbalance of the left eye or exophoria (left eye up, or right eye down); normal reading vision but abnormal peripheral (side) vision in the right eye which had a visual field loss of one-fourth or more and that eye by itself has suffered a 26% to 40% loss of function. Coupled with the additional loss due to double vision this resulted in a measurement of 30% disability of the body as a whole.
The injuries to the teeth were extensive. Dr. Allen Copping, the family dentist, testified she had a healthy set of teeth prior to the accident. Now she has a wire to hold parts of the upper jaw together and in this area there was a thickening of the membrane that cushions the teeth in the jaw. The teeth on the right side in the upper arch of the upper jaw will require extensive work to maintrain. Vitality tests show moderate to severely decreased vitality indicating those teeth will probably die. The first three teeth in the midline on the right side are moderately involved. From the biscuspid to the second molar they are moderately to severely involved. The decrease in vitality is due to an injury to the nerves which do not regenerate; the teeth discolor and must be capped. In the future she will require increased dental observation and care.
After returning home she was humiliated by her appearance, anxious and depressed, and had frequent nightmares. She clung to her parents and didn't want to engage in any activities, although she had been an active participant prior to the accident. Psychiatric treatment was administered by Dr. Burton White, a psychoanalyst particularly interested in teenagers, almost weekly from August, 1965 to the date of trial on February 1, 1967.
Arrangements were made for her to enter high school through a special gate to avoid being stared at by her classmates. Later she was encouraged to participate in college activities by living in the dormitory. She continued to be acutely aware of her appearance and most reluctant to be seen. During the year immediately prior to the trial her parents have noted some improvement in that she is now somewhat less anxious and depressed than she was before receiving the psychiatric treatment and they intend to have her continue the same for an additional two years or more.
It is conceded that Dale has made the maximum recovery to be expected from her serious injuries, but she has numerous permanent residual disabilities in addition to those already mentioned. She will continue to use many drugs for the rest of her life; the facial scars cannot be further improved; the diplopia and loss of visual field in the right side also are permanent; she cannot recover normal sensation in the involved part of the lip; the vitality in her teeth will not return and extensive future work will be necessary to maintain them, if indeed they can be saved; there is a deep pressure-like pain around the injured eye; she continues to be troubled by tearing from that eye; and mental anguish, particularly regarding her appearance, will remain.
In connection with our determination of whether the award for Miss Spizer's injuries is excessive or inadequate, and in accordance with the doctrine enunciated by the Supreme Court of Louisiana in Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149, and subsequent cases, we have considered the *533 amounts of awards granted or approved by appellate courts of this state for somewhat similar injuries in other cases in order to decide whether or not there has been an abuse of the "much discretion" given to the trier of fact by LSA-C.C. Art. 1934 (3). See particularly e. g. as to serious and permanent injuries, DeLaune v. Lousteau, La.App., 193 So.2d 907; Knotts v. Employers Casualty Company, La.App., 177 So.2d 630; Giardina v. American Automobile Insurance Co., La.App., 170 So.2d 237; Brunson v. Royal Indemnity Co., La.App., 166 So.2d 656; Golmon v. Fidelity & Casualty Co. of New York, Inc., La.App., 146 So.2d 461.
We are in agreement with the trial judge's conclusion that the jury verdict in the amount of $150,000 was excessive. We are also of the opinion that the award of $75,000 is neither excessive nor inadequate.
Defendants' contention that the special damages awarded to the original plaintiff in his individual capacity are excessive is limited to two items included in that award, which items they contend should be disallowed and the award reduced accordingly. The items referred to are: (1) a bill for professional services rendered by Dr. Vincent, the plastic surgeon, in the amount of $1,700; and (2) a bill for professional services rendered by Dr. White, the psychoanalyst, for $1,725. We find the contention is without merit.
Defendants argue the amount of Dr. Vincent's bill should be disallowed because the record reveals the original plaintiff is a medical doctor and Dr. Vincent's services to plaintiff's daughter were provided as a matter of professional courtesy with no intention of receiving payment for the same. Actually Dr. Vincent did render a bill and whether or not his services were extended as a professional courtesy is immaterial. For even if they would have cost plaintiff nothing, defendants cannot profit thereby. The value of nursing and physician's services, and of medical and hospital bills, incurred by the victim of a tort can be recovered from the tort feasor as an element of damages for the victim's injuries even though such services be gratuities rendered to the victim. Fullilove v. United States Casualty Company of New York, La.App., 129 So.2d 816; Williams v. Campbell, La.App., 185 So. 683; see also Bergeron v. Roberson, 224 La. 932, 71 So.2d 332; Wooten v. Central Mutual Insurance Company, La.App., 182 So.2d 146; Hughes v. Louisiana Power & Light Co., La.App., 94 So.2d 532. We note that Drearr v. Connecticut General Life Insurance Co., La.App., 119 So.2d 149, is a suit on an insurance contract and not in tort and Smith v. Foucha, La.App., 172 So.2d 318, is based on a subrogation.
Defendants challenge Dr. White's charges for psychiatric treatment on the ground that neither Dr. White nor any other psychiatrist testified as a witness and therefore the record contains insufficient proof that psychiatric care was needed, and if needed, to what extent, or that the charges were fair and reasonable. The only evidence offered by either side relative to psychiatric treatment and the need therefor was the testimony by Dr. Spizer. Defendants offered no medical evidence of any kind.
Dr. Spizer was qualified to, and did, testify as a medical doctor. His testimony and the other facts relative to his daughter's condition as established by the record leave no doubt at all in our minds as to the necessity for psychiatric treatment. Nor do we entertain any doubt concerning the fact that Miss Spizer needed all of the psychiatric treatment she was given; without contradiction of any kind, the evidence is that she continues to need such treatment. In view of the number of treatments administered almost weekly from August, 1965 to the date of trial on February 1, 1967, at $25 per visit or treatment, the charges appear to be reasonable. In any event, upon proper instructions from the court the jury found in favor of plaintiff on these matters and we see no error, *534 manifest or otherwise, in that finding of fact.
For the reasons assigned, the motion to dismiss the answer to the appeal is denied and the judgment appealed from is affirmed.
Motion denied; affirmed.