224 So.2d 84 (1969)
George J. BRIGNAC, Sr., Plaintiff-Appellee-Appellant,
v.
PAN AMERICAN PETROLEUM CORPORATION, Defendant-Appellant,
Leonard S. Withrow, Thelma Stegall Withrow and Trinity Universal Insurance Company, Defendant-Appellees-Appellants, and
Odell Vinson Oilfield Contractors, Inc. and Travelers Insurance Company, Defendant-Appellees-Appellants.
No. 2716.
Court of Appeal of Louisiana, Third Circuit.
June 12, 1969.
Dissenting Opinion June 24, 1969.
*85 Hall, Raggio, Farrar & Barnett, by R. W. Farrar, Jr., Lake Charles, for defendant-appellant, Pan American Petroleum Corp.
Cormie & Morgan, by Nathan A. Cormie, Lake Charles, for plaintiff-appellee, Edna M. Brignac.
Plauche & Plauche, by Allen L. Smith, Jr., Lake Charles, for defendant-appellee, Trinity Universal Ins. Co.
Jerry Kirk, Lake Charles, for plaintiff-appellee George Brignac.
Kaufman, Anderson, Leithead, Scott & Boudreau, by James A. Leithead, Lake Charles, for Leonard S. Withrow and Thelma S. Withrow, defendants-appellees-appellants.
Holt & Woodley, by Donald E. Walter, Lake Charles, for Odell Vinson Oilfield Contractors, Inc., defendants-appellees-appellants.
Before TATE, HOOD and MILLER, JJ.
MILLER, Judge.
Pan American Petroleum Corporation perfected a suspensive appeal from an adverse judgment based on a jury verdict rendered in two cases consolidated both for trial and appeal purposes. In this suit, George J. Brignac, Sr. was awarded damages of $38,000.00, representing damages to his pickup truck, medical expenses incurred and to be incurred for Mrs. Brignac's treatment, extra household expenses and loss of earnings to date and for the future.
In the second suit, Mrs. Edna M. Brignac was awarded damages of $75,000.00, representing pain, suffering and disability resulting from her injuries. The issues in the two consolidated suits are identical except that in Mrs. Brignac's suit, her husband's liability insurer Trinity Universal Insurance Company, is made an alternate defendant. The companion case of Brignac v. Pan American Petroleum Corporation, 224 So.2d 93, is decided this date for the reasons here assigned.
*86 The jury found no negligence by the plaintiffs, Mr. and Mrs. Brignac; or by defendants Odell Vinson Oilfield Contractors, Inc. (insured by Travelers), or Mr. and Mrs. Leonard S. Withrow (insured by Trinity).
Devolutive appeals have been filed by plaintiffs by which they seek only to have additional defendants cast to pay the judgment awarded against Pan American. Defendants, other than Pan American, have answered the appeal contending that the trial court's judgment is correct, but if it is to be reversed and any defendant is found negligent, then judgment is sought against other allegedly negligent defendants.
The Brignacs were occupants of a 1965 Dodge pickup truck owned and driven by Mr. Brignac when it struck a 1400 or 1500 pound Black Angus bull on Interstate Highway 10. They were then four miles west of Welsh, Louisiana, and the time was about 8:45 P.M. on August 12, 1965. The black bull was owned by the Withrows and was pastured just south of the site of this accident on land owned by them but under mineral lease to Pan American.
Pursuant to its lease rights, Pan American had arranged for the installation of a cattle guard in the fence on the Withrow property which bordered a service road paralleling Interstate 10. The actual installation of the cattle guard was by defendant Odell Vinson Oilfield Contractors, Inc., under contract from Pan American.
Applicable to the many issues presented in this appeal is the frequently stated rule that a reviewing court will not set aside a jury verdict where, although the evidence is conflicting, the testimony of the witnesses favoring the prevailing party, if accepted as credible, is sufficient to sustain the verdict. Sarvaunt v. New Hampshire Insurance Company, La.App. 3rd Cir., 1969, 220 So.2d 120.
The facts involving the collision between the pickup truck and the black bull are undisputed. The Brignacs had traveled to Lake Charles earlier that afternoon to visit their married son and his family on the occasion of the son's birthday. On their return to Opelousas, they were traveling about 55 to 60 miles per hour in the southernmost lane for eastbound traffic on Interstate 10, which was built to the usual interstate standards. His headlights were on dim because westbound traffic was approaching in the westbound lanes of I10. There was only one other vehicle in the eastbound lane and it was located some distance ahead in the same lane in which Brignac was traveling.
While proceeding in this manner, both Mr. and Mrs. Brignac saw a black object suddenly appear in front of the pickup, and both yelled "Look out" and immediately thereafter the left front of the pickup truck struck the bull causing the truck to stop a relatively short distance from the impact heading north and blocking both eastbound lanes. The bull came to rest on the north shoulder of the eastbound lanes. Mr. Brignac testified and Mrs. Brignac verified that he did not have time to swerve or apply brakes before the impact.
Although Mr. Brignac did not know exactly where the bull might have come from, he stated that if the bull had come from his left he would have seen it silhouetted in the oncoming headlights. Furthermore, he was certain that the eastbound vehicle which was some distance ahead of him had not swerved or slowed as if avoiding an object in the highway. The jury may have been persuaded that the heavy bull must have been moving fast from south to north at the time of impact because it came to rest some distance north of the point of impact.
A motorist driving upon the highways of Louisiana has a right to expect the highway to be free of livestock where there is in existence a "stock law" prohibiting livestock from roaming the highway. Where, as here, the driver is proceeding on a stock law highway, he is under no duty *87 to anticipate stock upon the highway right of way. Therefore, the burden of care on such a motorist is less than that of a motorist traveling on a highway not subject to the stock law. Parker v. Young, La.App. 1st Cir., 1960, 122 So.2d 699; Pugh v. Travelers Indemnity Company, La.App. 1st Cir., 1964, 166 So.2d 373. Although a motorist has the duty to keep his vehicle under control and to drive within a reasonable speed under the circumstances when an animal suddenly darts in front of his automobile traveling at a reasonable rate of speed on the highway, and the animal is struck before the driver can stop or swerve so as to avoid the accident, the accident is deemed unavoidable and there is no negligence or liability on the part of the driver. Pickett v. Travelers Insurance Company, La.App. 3rd Cir., 1961, 127 So.2d 547, Huval v. Burke, La.App. 3rd Cir., 1964, 160 So.2d 810.
Applying this law we cannot say that the jury was manifestly erroneous in concluding that the black bull came onto the highway from the field where he was pastured just south of the site of the accident and suddenly appeared in the path of Mr. Brignac's truck at a time when Mr. Brignac could neither swerve nor avoid the collision.
Pan American's counsel strongly urges that the jury erred in finding that Pan American was negligent in the installation and/or maintenance of the cattle guard. In effect, it is contended that it was impossible for the bull to have escaped his pasture by way of the cattle guard. The only photographs showing the cattle guard in place were polaroid pictures taken by an investigator for plaintiffs' counsel on or about August 22, 1965. These photographs and particularly photograph in evidence as Exhibit EB 11 indicate that the bull could have escaped his pasture by walking over the wing or inverted "V" frame by which the fence is connected to the east side of the cattle guard. While there is a great deal of impressive testimony that the 24-inch deep pit under the cattle guard extended for an additional 12 inches to the east of the cattle guard, and thus under the inverted "V" frame, the evidence was not uniformly to this effect. On the contrary, the photograph strongly suggests that the pit did not extend beyond the cattle guard itself; and that the ground under the inverted "V" frame was level with the pasture.
Withrow's testimony was generally to the effect that he inspected the fences around his property on many occasions and that he was satisfied that the cattle guard was properly installed. On one occasion he testified that if it had not been properly installed, he would have informed Pan American. On another occasion, he testified that had he thought the cattle guard would not hold his cattle in his pasture, he would have placed a fence across it. On the other hand, he testified at Tr. 405:
"Q. Mr. Whitrow, let me ask you this, sir. Was there room on the east end where they didn't have any post or any barb wire coming up,[1] was there room for the bull to pass on the east end?
"A. Well, yes, there was."
When Mr. Withrow testified that the cattle guard was properly installed, he was confronted with the above quoted testimony. Plaintiff's counsel informed Mr. Withrow on cross-examination that he would get a copy of his earlier testimony and go over it with him the following day. Mr. Withrow immediately clarified his testimony as follows: (Tr. 587)
"Q. * * * Could a bull have passed on the inside or the outside of the east portion of the cattle guard?
"A. Well, it's possible for him to maybe have got through on the outside of that wing.
*88 "Q. That's the east wing, is that right, sir?
"A. Yeah.
"Q. Do you remember now telling me that the last time you was on the stand, that he could have got out there, and you think he did?
"A. Well, I was mistaken on whether it was on the inside or the outside. I said the outside.
"Q. I just want to show how he got on the road. I am asking you if inside or outside, if you think the bull could have gone through there? Inside or outside?
"A. I'll say outside."
Then on the next day, counsel for plaintiff confronted Mr. Withrow with the typed transcript and the following appears at Tr. 600.
"Q. Now with regard to your testimony yesterday, I asked the court reporter to give me an excerpt of your testimony of day before yesterday, if I recall being the first day, I would ask you now if you remember my asking you the question as follows: `Now, looking at the east edge of the cattle where there was no black post sticking up and no wire coming up, would there have been room for the bull to have goten out on the east end?' and your reply, after several objections, wassee if you remember this answer'Well, yes there was.' Do you remember that answer?
"A. I do.
"Q. And you still stick to that answer, don't you, sir?
"A. I still what?
"Q. Your answer is still that today, isn't it, no different?
"A. Yes."
On recross-examination by counsel for Pan American, Mr. Withrow testified at Tr. 601:
"Q. How could he have gotten around it?
"A. Well, it's possible that he could have you know, squeezed through, but it was pretty close."
Mr. John Ardoin testified on behalf of the Withrows as an expert on the subject of fences and Black Angus cattle. He testified at Tr. 631:
"Q. At the point on these cattle guards where the rails end and the wing part, where it kind of lays over on a 45-degree angleat that point isn't there an area, if it's not dug out back here in the wing, where there be no rails, where an animal might come out if it's not dug out properly?
"A. If it's not dug out properly, and if your sides are up too high, well, it leaves a gap where a cow could sometimes go through, or any animal, calf or anything."
Counsel for Pan American suggest that there were at least three other reasonable hypotheses as to how the bull could have escaped, and that therefore the rule as to circumstantial evidence is applicable. The rule is stated in Sarvaunt v. New Hampshire Insurance Company, La.App.3rd Cir., 1969, 220 So.2d 120. Plaintiff is required to prove by a preponderance of the evidence that tortious conduct caused her injuries. Whether by direct or circumstantial evidence, this simply means that she must prove that it was more probable than not that the negligence of the other party caused her injuries; that the circumstantial evidence excludes other reasonable hypotheses with a fair amount of certainty. Naquin v. Marquette Casualty Co., 1963, 244 La. 569, 153 So.2d 395.
The first suggested hypothesis is that the bull could have escaped through a gate *89 which existed on the same fenceline served by the cattle guard. This gate was closer to the scene of the accident. However, the gate was found by one of the investigating officers to be securely fastened shortly after the accident. There is no evidence to suggest that the gate was in anyway defective or had been damaged.
Secondly, it is suggested that the bull escaped through a canal which was discussed at various times during the trial. A close reading of the record convinces us that the canal does not go under the fence which keeps cattle from Interstate 10. Furthermore, all witnesses admitted that the fence was in excellent condition with the exception of one witness who contended that the fence was defective within 20 feet of both sides of the cattle guard.
Likewise, we find no merit to the third hypothesis that the fence was defective. This contention is carefully considered below where we discuss the issue as to the alleged negligence of the Withrows.
In the light of the quoted testimony, together with the pictures taken August 22, 1965, and other evidence negating any other possible route of escape for the bull, we fail to find manifest error in the jury's finding of negligence on the part of Pan American.
While evidence was conflicting on the issue of negligence on the part of the Withrows concerning the condition of the fence, we concur with the jury's conclusion that the Withrows were free from negligence. It was clear that the Withrows had no responsibility for connecting the fence to the cattle guard or for maintaining the cattle guard.
The Withrows established that they had a crew repair all fences once each year; that this fence had been repaired in December of 1964, or January of 1965; that in addition, Mr. Withrow rode horseback around his fences two or three times each month and always carried staples and a hammer and made repairs whenever needed. The day after the accident a careful check was made and there was no indication that the bull had escaped through the fence. The evidence was convincing that had the 1500 pound bull gone through the fence, there would be no trouble in locating where this had happened. The only photographs showing the condition of the fence were made in February, 1966. By that time, the cattle guard had been moved, the pit under the guard filled and new poles set and strung with wire which had been tied into the fence portrayed in the pictures. This work to remove the cattle guard and replace and repair the fence was performed more than four months after the accident and about two months before the photographs were made.
The February, 1966 pictures allegedly showed portions of the fence located within 20 feet of either side of the place where the cattle guard had been. Plaintiffs' counsel's investigator testified that the condition of the fence in February, 1966 was identical to that which he saw on August 22, 1965 when he first visited the area. This investigator also testified that the remainder of the fence was in excellent condition, essentially agreeing with all other witnesses on this subject except that the others stated that the entire fence was in good condition. The February, 1966 pictures do indicate that the fence was not perfect. Even if the jury was convinced that the condition of the fence in February, 1966 (after the cattle guard had been removed) was the same as on August 22, 1965, we fail to find error in their conclusion that the bull did not escape through the fence, and that the Withrows were not negligent.
Although Pan American does not contend that the Withrows are in any way responsible for the condition of the cattle guard, nor for the manner in which the cattle guard was attached to their fence, we note that Mr. Withrow did not direct Pan American to make a better connection of their cattle guard to the Withrow fence. We pretermit this issue first because Pan *90 American does not raise it, and secondly for the reason that the Withrows sued Pan American and answered the appeal to contend that Pan American is liable to them for any defects which Pan American caused to the Withrow fence.
The record also supports the jury's finding that Odell Vinson Oilfield Contractors, Inc. was not negligent. All witnesses for Pan American stated that they were completely satisfied with the manner in which the cattle guard was installed by Vinson's employees. Pan American contracted for the work and it alone was responsible for accepting Vinson's work and for the design and maintenance of the cattle guard, as well as the pit below the cattle guard.
We find the jury's award of $38,000 to Mr. Brignac and $75,000 to Mrs. Brignac to be supported by the evidence. Mrs. Brignac's past medical expenses totaled $5,820.26. Repairs to the pickup truck and wrecker service totaled $729.95. Additional household help was required for a two year period and the cost for this was $626. The balance of the $38,000 award covered future medical expenses for Mrs. Brignac and her substantial loss of earnings.
The evidence left no doubt that as a result of the injuries suffered in this accident, Mrs. Brignac will have additional medical expenses for the balance of her life, and that she will never be able to return to work.
Appellant cites McFarland v. Illinois Central Railroad Company, 1961, 241 La. 15, 127 So.2d 183, 87 A.L.R.2d 246 and Pennington v. Justiss-Mears Oil Company, 1961, 242 La. 1, 134 So.2d 53, as denouncing the use of a mathematical formula in reaching an award on loss of future earnings and stating that discretion must be used taking into consideration various other factors. While we find this to be the law, we cannot disregard testimony which supports a substantial award for loss of earnings.
Mrs. Brignac was 57 years of age when she was injured. Her employer testified that mandatory retirement age was 65. She had been employed with the Louisiana State University Cooperative Extension Service as a Civil Service typist-clerk. In that capacity she was required to handle files, carry objects and sit for extended periods of time. Her employer testified that she was one of the best employees of her classification that he had ever seen and that she could have continued on the job until mandatory retirement so far as he was concerned. Mrs. Brignac worked continuously in that job from 1952 until August 13, 1965. She had accumulated a great deal of sick leave and annual leave or vacation time which carried her as an employee until May 23, 1966 at which time she was retired on disability retirement. She was well respected in the community, active in civic and religious affairs, and held in high regard by her co-employees.
As a result of the accident, she used all of her sick leave, accumulated leave and vacation time. She was forced to accept an early disability retirement which substantially reduced the retirement she would have earned. It was substantially reduced because it was based both on a shorter tenure of service and on a lower salary schedule.
When injured her salary was $365 per month, but subsequent to that date and prior to trial several raises had been made for her classification. As of the October, 1968 trial, her monthly salary would have been $440. According to her employer's calculations her loss of earnings after deducting her monthly disability retirement pay of $74.84 (which she has received since May, 1966), was approximately $29,000. This allowed nothing for her loss of increased retirement benefits. Nor did this allow for the possibility of future increases in salary.
While we find the award for future medical expenses and for loss of earnings high, we find no abuse of discretion in the jury's award. Gaspard v. LeMaire, 1963, *91 245 La. 239, 158 So.2d 149; Lomenick v. Schoeffler, 1967, 250 La. 959, 200 So.2d 127.
As a result of the accident Mrs. Brignac sustained a dislocation of her right hip with multiple fractures about the hip joint. This caused permanent disability and pain.
Dr. Robert Luke Bordelon, orthopedic surgeon of Opelousas, has been Mrs. Brignac's treating physician. He first saw her for these injuries during the early hours of August 13, 1965. The entire rim of the hip joint was shattered and the hip was thrown completely out of place. Under general anesthetic, attempts were made to return the hip to the joint, but it fell out of the socket each time it was set. Dr. Bordelon then put a large pin through her tibia and put weight on her leg to hold the hip in place. On attempting to put Mrs. Brignac in bed the hip slipped out of place again. Surgery was again undertaken during which a large number of pieces of bone were put back into place and fixed with screws. At the conclusion of this operation, because of a drug reaction, Mrs. Brignac would not resume breathing without the aid of the anesthetic equipment. After two hours of assistance, she resumed breathing naturally. For five weeks she was kept flat on her back in the hospital bed and in traction. On September 28th she was released to go home but was limited to walking on crutches without weight bearing. On October 12, 1965 she was returned to the hospital in excruciating pain, for the bone fractures had given way and the hip was again out of place.
A cup orthoplasty was performed. A titanium cup was inserted and fitted on the head of the femur so the femur head would not slip out. The head of the femur was found to be damaged and had to be repaired. Muscles were cut so that the femur head could fit into the cup and the muscles were reattached. Again she remained in bed with traction for a six week period.
Dr. Bordelon testified that for all practical purposes Mrs. Brignac had been in the hospital from August 13 to December 15, 1965. At the time of her release from the hospital she was still bedridden and allowed in a chair only for short periods.
Mrs. Brignac was rehospitalized again on January 9, 1966 for an infection of the hip and again in February of 1966 for the removal of wires used to hold displaced bones in place. She undertook extensive physical therapy in an effort to learn to use her leg again. Weight bearing on the leg began in September of 1966 and then with the aid of crutches. In April of 1967 she began to walk with a cane. In the opinion of her physician, Mrs. Brignac made excellent progress because of her cooperation and willingness to take the painful exercises for her own rehabilitation.
Dr. Bordelon opined that Mrs. Brignac would need medical care for her hip for the rest of her life, and will always need a cane to help her walk. She must be careful with her hip and cannot abuse it in any way. She must rest when the hip becomes sensitive or she will suffer extensive pain. She cannot sit for extended periods of time, nor can she perform any activity that would require her to be up and about for any extended time.
Mrs. Brignac sustained a loss of fifty per cent of her lower right extremity and a twenty-five per cent impairment of her body functions as a whole. In the Doctor's opinion she suffered extensive pain and will suffer pain and discomfort with her hip for the remainder of her life.
We are unable to find a great abuse of discretion in the jury award of $75,000 for past, present and future pain, suffering and disability suffered by Mrs. Brignac as a result of this accident. Gaspard v. LeMaire, supra; Lomenick v. Schoeffler, supra.
Accordingly, the judgments of the district court are affirmed. Costs are to be paid by appellant Pan American.
Affirmed.
*92 HOOD, Judge (dissenting).
I am unable to agree with some of the conclusions which have been reached by the majority.
Although the evidence is not convincing, I am willing to yield to my colleagues in their finding that Pan American Petroleum Corporation was negligent in failing to have the cattle guard properly constructed. Even with that concession, however, I think my colleagues have erred in holding that Pan American's negligence was a proximate cause of the accident, or that it is liable to plaintiffs for the damages which they sustained.
There was no direct evidence as to how the bull escaped from the pasture. Some circumstantial evidence was presented which, according to the majority opinion, shows that the animal "could have escaped" through the defectively built cattle guard. The majority has based its decision that Pan American is liable in damages on this circumstantial evidence.
The established rule is that where circumstantial evidence alone is relied upon to show negligence on the part of the defendant, such evidence must not only show that it is more probable than not that the negligence of the defendant caused the injury, but it also must exclude every other reasonable hypothesis but the one relied upon. Lanoix v. Home Indemnity Co. of New York, 13 So.2d 501 (La.App. 1st Cir. 1943); Lambert v. State Farm Mutual Automobile Insurance Company, 184 So.2d 107 (La.App. 4th Cir. 1966); Gassiott v. Gordey, 182 So.2d 170 (La.App. 3d Cir. 1966); O'Pry v. City of Opelousas, 124 So.2d 333 (La.App. 3d Cir. 1960); Lanza Enterprises, Inc. v. Continental Insurance Company, 142 So.2d 580 (La.App. 3d Cir. 1962).
Pan American has suggested that there were at least three other reasonable hypotheses, not involving negligence on the part of that defendant, as to how the bull could have escaped. My Colleagues have rejected all three of these suggestions, and apparently disregarding the rule as to circumstantial evidence, they have concluded simply that "we fail to find manifest error in the jury's finding of negligence on the part of Pan American." I feel that at least two of the explanations as to how the bull escaped are reasonable, and that the majority erred in failing to apply the applicable law.
As noted by the majority, there was a wire gate in the fence around Withrow's pasture. This gate was closer to the place where the accident occurred than was the cattle guard. The gate, in fact, was so close to the scene of the accident that after the bull was struck the carcass of that animal was dragged from the highway through that nearby gate, rather than over the cattle guard which was a greater distance away. It is true that the gate was found to be closed sometime after the accident occurred, but it was not locked, and anyone could have opened it. The cattle guard apparently had been adequate to retain all of Withrow's herd of 25 or 30 cattle in that field for a period of at least four months prior to the date of this accident, with not a single animal having gone through it. Withrow conceded that it was possible for someone to have left the wire gate open, and I think the hypothesis that the bull escaped through the gate is reasonable. In fact, I think it is much more reasonable to conclude that the bull escaped through the gate than that he crossed the cattle guard.
Another hypothesis or explanation as to how the bull escaped is that it went through a defective part of the fence. The evidence shows that the fence was in very bad condition in several places. The pictures in the record establish clearly, I think, that a large bull could easily go through the fence in a number of places. My colleagues concede that the pictures "do indicate that the fence was not perfect," but then they brush that finding aside with the statement, "We fail to find error in their conclusion that the bull did not escape through the fence." I think a reasonable explanation for the escape of the *93 bull was that it went through a defective part of the fence.
In my opinion, therefore, there are at least two reasonable hypotheses, other than the one offered by plaintiff, as to how the bull escaped from Withrow's pasture. Actually, I think the theory or hypothesis offered by plaintiffs is the least likely or least probable of the three, and that my colleagues have erred in failing to apply the above stated circumstantial evidence rule.
I also am unable to agree with the majority's conclusion that Mr. and Mrs. Withrow are not liable. As observed in the majority opinion, there was a "stock law" prohibiting livestock from roaming the highway at that point, and the burden thus rested on the owner of the bull to show that he was free from negligence in allowing this particuar bull to escape. Withrow admitted that he knew that the bull could have "squeezed through" the cattle guard, and yet he did nothing about it. The evidence also shows that the fences were bad and that a wire gate adjacent to the highway was left unlocked. Withrow allowed the bull to remain in that pasture under those circumstances for four months. The evidence thus shows that Withrow was negligent in failing to maintain the animal in a secure enclosure.
The majority has a pretermitted the issue of the Withrows' liability assigning as reasons therefor that "Pan American does not raise it" and because "the Withrows sued Pan American." I do not feel that plaintiffs should be denied their right to recover from the Withrows for these reasons. Both of the plaintiffs have appealed, and on this appeal they demand that the judgment of the trial court be amended to allow them to recover against the Withrows. I think the majority has erred in rejecting those demands.
Finally, I feel that the awards made in both of these consolidated cases are grossly excessive and should be reduced.
For these reasons I respectfully dissent.
NOTES
[1] At the west end of the cattle guard a fence post was set inside the inverted "V" wing attached to the cattle guard.