250 So.2d 543 (1971)
Willie E. JOHNS and Patsy Dewanna Howell Johns, Plaintiffs-Appellees,
v.
HUNT LUMBER COMPANY, Inc., et al., Defendants-Appellants.
No. 11637.
Court of Appeal of Louisiana, Second Circuit.
June 22, 1971.
*544 Theus, Grisham, Davis & Leigh by R. L. Davis, Jr., Monroe, Barham Wright, Barham & Dawkins by Charles C. Barham, Ruston, Christovich & Kearney, by A. R. Christovich, Sr., New Orleans, for defendants-appellants.
Holloway, Baker, Culpepper, Brunson & Cooper by William H. Baker, Bobby L. Culpepper, Jonesboro, for plaintiffs-appellees.
Before AYRES, HEARD and HALL, JJ.
HEARD, Judge.
On March 28, 1969 about 6 o'clock p. m. Patsy Dewanna Johns was driving a Chevrolet automobile south on Louisiana Highway 167 in the Village of Hodge, Louisiana. Near the entrance to the parking lot of the Big Star Food Store on the west side of the highway, a 1969 Ford log truck, driven by Ted Boston, made a left turn directly in front of the Johns vehicle. The truck was owned by Boston's employer, Hunt Lumber Company, Inc., and insured by a public liability policy issued by Aetna Life and Casualty Company in the amount of $100,000.
As a result of the collision Mrs. Johns suffered near fatal injuries, sustaining a deep laceration in the neck which extended into the floor of her mouth through the muscle and soft tissue of the neck. Although major blood vessels were intact, only through alert efforts of bystanders was the flow of blood stopped. Mrs. Johns was rushed to Jackson Parish Hospital, thence to the Lincoln General Hospital in Ruston where she was attended by Dr. Marvin Green, Jr. X-rays determined that Mrs. Johns also had a fracture of the second cervical vertebrae, involving the odontoid process, with marked displacement of the fractured fragments and attached vertebral segments. Dr. Green's immediate treatment consisted of suturing the neck wound, performing a tracheotomy to insure breathing and placing Mrs. Johns in a neck halter apparatus. In addition he removed numerous small bits of glass from her face and head, and treated the patient for a broken rib, multiple abrasions and contusions.
After four days in Lincoln General, Mrs. Johns was transferred to St. Francis Hospital in Monroe and placed in the care of an orthopedist, Dr. Roy Ledbetter, who first saw her on April 1, 1969 in the emergency room of St. Francis Hospital. As soon as feasible she was taken from the emergency room to the operating room where her head was shaved and traction, or Crutchfield tongs, were inserted in her skull. This was accomplished by drilling two small holes in the outer layer of the skull where the tongs were inserted and fastened. The purpose of the tongs was to provide a means whereby traction is applied to the cervical spine to reduce fractures or dislocations and to maintain that reduction. Following this procedure Mrs. Johns was moved to a hospital room where she was placed on a special bed with two mattresses. A shorter mattress was placed on top of the regular mattress to permit her head to extend over the shorter mattress and be pulled down and back by the traction. Thirty pounds of weight was first placed on Mrs. Johns and x-rays made every hour until the fracture was reduced, the weight being correspondingly reduced to two or three pounds. The patient remained in this traction apparatus for 35 days.
Drs. Ledbetter and Green commented on the unusually severe nature of the fracture being such that in most cases the patient either died or was paralyzed from displaced bone fragments which usually sever or injure the spinal cord. Mrs. Johns was told that she should not move her head and testified that she overheard the discussion about the severity of her injuries. As a result she became quite frightened and apprehensive of making any movement that might cause her death or her paralysis.
In due time, the stitches were removed from Mrs. Johns' neck and the tracheotomy *545 tube removed. On May 6, 1969 she was taken to the operating room and the Crutchfield tongs removed, after which the wounds of the tongs were cleansed and dressed. She was then placed on a special fracture table and a plaster of Paris body cast or Minerva Jacket applied extending from the top of her head to below her waist, containing holes for her ears, face, arms and upper abdomen. She wore this cast until July 9, 1969 during which period she could walk, sit or lie down, but these maneuvers were difficult because of the weight which is involved in such an appliance. On July 9, 1969 the fracture was shown by x-ray to be healing satisfactorily, the Minerva Jacket was removed and a metal neck brace prescribed. She wore the metal neck brace constantly, even while sleeping, until its removal on August 20, 1969. At that time a soft collar was prescribed to give support against extreme motion. On September 10, 1969 the patient was allowed to remove the soft collar except when traveling in an automobile. On October 22, 1969 Mrs. Johns was referred to a physical therapist in an effort to relieve persistent tightness and restricted neck motion. On this date the vertebrae was found to be solidly and completely healed. She next saw Dr. Ledbetter on December 23, 1969. At that time he performed a nerve block to alleviate persistent headaches. On March 18, 1970 she was again examined and found to have no muscle spasm, full range of forward neck bending, backward bending was limited to 75% of normal and occasional headaches. Normal side to side movement of the head is 90 degrees to the right or left. Mrs. Johns had 80 degrees to the left and 60 degrees to the right. Her last visit on June 17, 1970, revealed she was doing quite well but having some episodes of tight feeling in her neck muscles for which a cervical traction apparatus was recommended for home use whenever needed.
Dr. Ledbetter stated there was no appreciable weakness in bone structure, but that there was some loss of elasticity in the surrounding muscles and tendons. He reported no evidence of arthritic changes in Mrs. Johns but some might occur with age, and that she should be able to carry out her regular work, with only occasional periods of transient discomfort.
Prior to the accident Mrs. Johns had been employed at the Jonesboro State Bank for 17 years. Her job entailed operation of large mechanical bookkeeping machines. Mr. I. J. Allen, president of the bank, stated that she was one of the best employees he had ever had, but that her efficiency was sharply reduced after the accident. Her payroll records revealed that she was able to work between 18 and 30 hours per week in October, November and December 1969 and that her time increased and fluctuated near 35 hours per week from January through July, 1970.
The Johns filed suit against Hunt Lumber Company, Inc., Ted Boston and Aetna Life and Casualty Company, in solido, on March 2, 1970. Petitioners prayed for judgment in the amount of $818,932.87: $484,500 for Mrs. Johns individually, and $334,432.87 for Mr. Johns as head and master of the community of acquets and gains. Defendants answered asserting its policy limits of $100,000 and claiming credits of $11,750.68. Aetna paid lost wages of $3,704.40, medical expenses of $8,046.28 under its FAST program, and expressed willingness to pay additional medical expenses and lost wages.
At trial Aetna conceded Ted Boston's negligence was the sole cause of the accident. The trial judge awarded Mrs. Johns $120,000 damages: $50,000 for physical pain and suffering, $50,000 for mental pain, anxiety, worry and suffering, and $20,000 for permanent disability and disfigurement. The husband was awarded judgment in the sum of $45,968.33. Hunt Lumber Company was held liable for damages in excess of Aetna's policy limits. Ted Boston was found to have been acting in the course and scope of his employment while driving the truck. Defendants appealed from the judgment and plaintiffs *546 answered the appeal seeking an increase in the award.
Two questions are raised on appeal: (1) quantum, and (2) whether or not Ted Boston was in the course and scope of his employment at the time of the accident.
The trial court is vested with much discretion in awarding damages and such awards should not be disturbed on review in the absence of abuse of that discretion. However, in our opinion the trial court's award of $120,000 in this case constitutes an abuse of discretion and is manifestly erroneous. While we do not lose sight of the well-settled principle that each case must be decided on the basis of its own facts and circumstances, reference must be had to similar cases for a determination of whether an award represents an abuse of discretion. Chaney v. Carrol, La.App., 224 So.2d 57 (1st Cir. 1969) writ refused, 254 La. 797, 226 So.2d 923 (1969) and Tubbs v. Allstate Insurance Company, La.App., 238 So.2d 395 (3d Cir. 1970).
In Brunson v. Royal Indemnity Company, La.App., 166 So.2d 656 (1st Cir. 1964) a middle-aged man received a severe laceration of the forehead, cervical strain of the neck and a ruptured disc in his back. Brunson was operated on for the ruptured disc and bedridden for nearly two months. He was wearing a back brace a year after the collision. His injuries necessitated further treatment and one, possibly two, additional operations. Brunson was awarded $30,000 for pain and suffering.
In DeLaune v. Lousteau, La.App., 193 So.2d 907 (1st Cir. 1967) a forty-six year old female, employed as a research chemist, received cervical and thoracic sprains, compression of the fifth and sixth cervical nerve roots and cervical spondylosis. Plaintiff underwent a cervical laminectomy, requiring twenty-six days hospitalization and continuous sedation. The orthopedic surgeon stated that another operation would have to be performed and that she would have to continue to wear a metal neck brace. She was awarded $50,000 for pain, suffering and permament disability.
In Brignac v. Pan American Petroleum Corporation, La.App., 224 So.2d 84 (3d Cir. 1969) a fifty-seven year old woman was awarded $75,000 for dislocation of her right hip and multiple fractures about the hip joint. The entire rim of her hip socket was shattered, causing the hip to slip out of place whenever it was set. This necessitated the performance of a cup orthoplasty, whereby a metal cup is fitted over the head of the femur to prevent slippage. She remained in the hospital for six months, and was first able to walk with a cane two years after the accident. The orthopedic surgeon testified that she would need medical care for the rest of her life and could walk only with the aid of a cane.
Although there are no cases in our jurisprudence that have dealt with Mrs. Johns' particular injuries, we find guidance in the above cited cases. Mrs. Johns' injuries were not as painful and difficult to mend as Mrs. Brignac's, nor as lasting as Miss DeLaune's; however the injuries in the instant case were near fatal.
Mrs. Johns was confined in the hospital for days with the knowledge that one wrong move of her head or body could sever her spine and result in her death or paralysis. After removal of the Crutchfield tongs she was encased in the Minerva Jacket which was no doubt uncomfortable. After these measures, the metal neck brace and soft collar must have felt like unbridled freedom. They too were restrictive and uncomfortable. Although we believe her injuries severe, we do not consider $100,000 for physical and mental pain, suffering and mental anguish is warranted. After careful consideration, we believe damages in the amount of $65,000 is ample to compensate Mrs. Johns for pain, suffering and disability.
*547 Neither is the award of $20,000 proper for permanent disability and disfigurement. The uncontroverted medical testimony of Dr. Ledbetter, orthopedic surgeon, is to the effect that Mrs. Johns would suffer minimal permanent disability. Dr. Worthen, a plastic surgeon, stated in his report that plastic surgery would entail three nights hospitalization and with a satisfactory result of the surgery she should have only temporary fine line scars for a period of six to twelve months. The scars would then satisfactorily fade and blend to the point of elimination of the question of a residual disfigurement. For these reasons we believe that Mrs. Johns will have no permanent disfigurement.
Mr. Johns, as head and master of the community, was awarded damages in the amount of $45,968.33. The itemized list of damages totaled $47,968.33. He was awarded $8,046.28 representing medical expenses and $3,704.40 as Mrs. Johns' lost wages from the date of injury until October 11, 1969 when she returned to work. Aetna paid these amounts under its FAST program and is entitled to this credit.
An award of $1,000 for future medical expenses and $1,000 future drug expenses is unwarranted by the evidence. Dr. Ledbetter stated he considered Mrs. Johns completely healed and not disabled and there is no evidence of any need for medical services relative to this injury. He stated Mrs. Johns would have transient periods of discomfort and periodic changes of personality of a temporary nature. These episodes will require medication of some degree, aspirin or perhaps Darvon. However, we believe $500 will adequately cover Mrs. Johns' drug requirements in the future. See Poche v. Frazier, La.App., 232 So.2d 851 (4th Cir. 1970). The Johns incurred additional medical expenses prior to trial of $75.00 and additional drug expense of $57.25. Aetna does not dispute these figures and admits liability for them.
The trial judge awarded $915.00 for plastic surgery. Aetna expressed willingness to pay this amount. An award given for past and future travel expense amounted to $500; however, only $261.00 of this amount was proven. No showing was made for any need for future travel expense. Mrs. Johns was released by Dr. Ledbetter in June, 1970 and was no longer taking physical therapy in Ruston. The award is reduced to the amount actually incurred and proven.
Mr. Johns was awarded $2,277.65 representing Mrs. Johns' lost wages from October 11, 1969 to date of trial, July 27, 1970. We find no error in granting lost wages to the date of trial. Her employer and employees at the bank testified that she could only work part time. Counsel for plaintiffs contend that Mrs. Johns lost average weekly wages in the amount of $55.55 which was accepted by the trial judge. We find no abuse of discretion in this figure. The trial judge further awarded $30,000 for Mrs. Johns' future lost wages. Dr. Ledbetter testified that Mrs. Johns would have transitory periods of discomfort, although in his opinion she could do a full day's work. We believe $5000 adequately compensates. Mrs. Johns for future lost wages. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968).
Mr. Johns was awarded $400 for loss of wages during his wife's hospitalization. This award is proper because he was required to take off from work when he had difficulty in lining up qualified nurses to stay with his wife. Further, her grave condition dictated his presence with her in the hospital. The cases to the contrary, Jaeger v. Herald, La.App., 186 So.2d 365 (4th Cir. 1966) and Buckelew v. Plunkett, La.App., 242 So.2d 372 (2d Cir. 1970) involved far less serious injuries and the parties involved were capable of making other arrangements for the care of their spouses.
*548 Expert witness fees, as set by the trial court, are found proper and stand. Those are: Dr. Green, $50.00; Dr. Ledbetter, $75.00; Dr. Worthen, $50.00 and the Court Reporter, $127.85.
The trial court held that Hunt Lumber Co. was liable for that portion of the judgment in favor of Mrs. Johns in excess of Aetna's policy limits. Because Hunt Lumber, Aetna and Ted Boston were sued in solido and because of the importance of the issue, we are compelled to address ourselves to that issue, notwithstanding the reduction of awards below the limits of the policy.
The uncontroverted evidence is that Ted Boston was employed by Hunt Lumber Company to drive the truck and haul logs. He lived in the small town of Bienville some 30 miles from the mill in Dodson. Hunt Lumber allowed him to take the truck home at the end of the day. Each morning he would drive to an appointed place and receive his assignment for that day's work. On the day of the accident, which was Friday, Boston had unloaded his last logs and received his pay. He was then to meet his wife in Hodge and they were to purchase their groceries at the Big Star Grocery Store. In going to Hodge he had to take a different road than the one he would have taken going straight home to Bienville. As he made his left turn on the highway to the Big Star Grocery the accident occurred.
The learned trial judge found that Boston was within the course and scope of his employment at the time of the collision. His conclusions were supported by the case of O'Brien v. Traders and General Insurance Company, La.App., 136 So.2d 852 (1st Cir. 1962). We find that this case lends no support to the proposition that Hunt Lumber Company was liable under the doctrine of respondeat superior. In that case, Austin W. Johnson, an assistant county agent employed by Louisiana State University, the insured of Traders and General, was involved in a collision with Thurman O'Brien. Johnson was enroute to Baton Rouge to a meeting which he was ordered to attend by his employer. Johnson was driving his own automobile with mileage paid from his home in Franklin Parish. The trial court found Johnson not to be within the course and scope of his employment at the time of the collision. The First Circuit Court of Appeal reversed, stating that the payment of mileage to Johnson on a mission ordered by his employer, placed him within the course and scope of his employment. The instant case has only one of these characteristics, the payment of gas and oil used in the truck. Boston was given the truck to drive, although he was not ordered on his mission.
The problem of an employee's course and scope of employment relative to the application of the doctrine of respondeat superior is not new to the courts of our state. Each case must be decided upon its own facts. Wills v. Correge, La.App., 148 So.2d 822 (4th Cir. 1963) involved an accident in which a salesman struck and injured a child. The salesman was on his way home in his own car for which he received no expenses from his employer. Plaintiff sought to hold the employer liable, relying on the O'Brien case, supra. The court held that the salesman was not within the course and scope of his employment while driving his own car from work, with no distinguishing features to lead to a contrary conclusion. Two years later the Fourth Circuit was faced with the same question. In Phoenix Insurance Company v. Bennett, La.App., 176 So.2d 682 (4th Cir. 1965) an employer-owned employee-operated vehicle was involved in an intersectional collision as the employee was on his way home from work. The employer sought to recover damages from the other driver. The court upheld the general rule, as stated in Wills v. Correge, supra, that an employee on his way home from work is not within the course and scope of his employment.
*549 The most recent case is that of Laird v. Travelers Indemnity Company, La.App., 236 So.2d 561 (4th Cir. 1970). That case involved an employee who had taken his personal car away from the jobsite in order to eat lunch and while returning to work was involved in an accident. Plaintiff sought to hold the employer and insurer liable, claiming that the employee providing his own transportation to and from work and lunch was a benefit to the employer thereby rendering it liable for the employee's acts. The court held that the test for employer liability is not benefit to the employer but whether the employee is exercising the functions for which he is employed. Going to and from lunch, as well as to and from home, is not ordinarily within the course and scope of one's employment.
We are of the opinion that the cited authorities dictate no other conclusion than that Ted Boston was outside the course and scope of his employment. Going to Hodge and to the grocery store was strictly a personal mission and of no benefit to his employer, nor was it an exercise of a function for which he was employed. Therefore, no liability attached to Hunt Lumber Company by the acts of its employee, Ted Boston.
For the reasons assigned, the judgment appealed from is reversed insofar as it casts Hunt Lumber Company, Inc. in judgment, and the demands against Hunt Lumber Company, Inc., are rejected. In other respects the judgment is amended to reduce the award in favor of Mrs. Patsy Dewanna Johns to the sum of $65,000 and to reduce the award to Mr. Willie E. Johns to the sum of $21,236.58. In all other respects as thus amended the judgment is affirmed.
Appellants Aetna Casualty & Surety Company and Ted Boston are assessed with all costs.