PETERS, Judge ad hoc.
This suit results from an automobile collision which occurred in Washington Parish on October 27, 1968 at the intersection of Louisiana Highway 25 and Louisiana Highway 438. Plaintiff, Virginia Cline, was a passenger in a vehicle owned by Dr. J. B. Ware and operated by his daughter, Jennifer J. Ware. Plaintiff, age 21, and Jennifer J. Ware, age 19, both residents of Kentucky, were students and classmates at Murray State University, Murray, Kentucky. The young coeds had spent a weekend in New Orleans visiting friends at Tulane University and were returning to school. The Ware vehicle was traveling in a western direction on Louisiana Highway 438 and approached the intersection of Highway 25, known as the Franklinton-Tyler-town Highway. A stop sign facing Louisiana Highway 438 controlled the intersection, with Highway 25 having the right-of-way. The collision occurred when Miss Ware drove her automobile into the intersection and was struck by a southbound vehicle owned and operated by O. C. Cor-kern. Plaintiff sustained extensive injuries as a result of the collision.
Made defendants were Jennifer J. Ware, J. B. Ware and his insurer, Illinois Nation *589 al Insurance Company and Corkern. The trial court exonerated Mr. Corkern from any negligence, and held the sole cause of the collision was the negligence of Jennifer J. Ware in driving her automobile into a favored highway into the oncoming vehicle.
Liability was not seriously disputed in this matter. There is no evidence in the record to indicate any negligence on the part of Mr. Corkern in the operation of his vehicle. Miss Ware admits when she approached the intersection she came to a near complete stop, and then pulled out into the Franklinton-Tylertown Highway without properly ascertaining that the road was clear. We therefore exonerate Cork-ern from any negligence in the case and affirm the dismissal of the suit against him.
Defendants allege plaintiff was engaged in a joint venture with Miss Ware in the operation of the vehicle in an attempt to impute the negligence of the driver to the plaintiff. There was no evidence in the record to substantiate these allegations of a joint venture in the use of the automobile by the plaintiff and Jennifer Ware which could be legally imputed to plaintiff so as to bar recovery. We also concur with the conclusion of the trial court that the sole and proximate cause of the accident was the negligence of Jennifer J. Ware in failing to yield the right-of-way to the favored thoroughfare and in failing to maintain a proper lookout.
The trial court ruled in favor of plaintiff awarding total damages of $110,352.-92, limiting plaintiff’s judgment against the defendant insurance company to its policy limit of $100,000.00. The trial court’s judgment was broken down into an award of $60,000.00 for “pain, suffering and disfigurement”, $35,000.00 for “disability and loss of earning capacity” and “$15,352.92 specials”, for medical expenses incurred, subject to a credit of $9,973.38 previously paid by defendant Illinois National Insurance Company.
Thus, the crux of this appeal is the quantum of the award made to plaintiff by the trial court and whether this award is grossly excessive and constitutes an abuse of discretion.
The medical evidence presented by plaintiff establishes that Dr. Joseph Maybey, a surgeon at Ochsner’s Foundation Hospital, saw plaintiff immediately upon her admittance to the emergency room of Ochsner where his initial diagnosis was brain injury and internal bleeding. He noticed a mass in her lower abdomen and surgery was performed to stop a bleeding artery. Several incisions were made in plaintiff’s limbs to place surgical tubes during the abdominal operation. The operation required an extensive incision in the lower abdominal area. A tracheostomy was performed because of plaintiff’s irregular breathing. The tube from the tracheostomy remained in the girl until December 8, 1968. Dr. Maybey testified plaintiff was in shock 'with practically no pulse or blood pressure. In his opinion she was in very serious physical condition which he described as “near death”. Subsequent examination revealed plaintiff suffered a contusion of the right lung, a fracture of the ramus of the pelvis where the femur attaches to the pelvis on the left side; and a fracture of transverse process of the fourth lumbar vertebra on the right side. Additionally, plaintiff had no profusion of her kidneys which required surveillance. Also, on November 23, 1968 plaintiff was diagnosed as suffering from a “stress ulcer”, which resulted from the stress of the injuries she had received.
Dr. Homer D. ICirgis, neurosurgeon at Ochsner’s Foundation Hospital, also examined plaintiff shortly after her admission to Ochsner Hospital on October 27, 1968. His neurological examination and diagnosis was she had sustained a severe contusion of the cerebrum, brain stem and a possible intracranial hemorrhage. A carotid an-giography as well as a vertebral angiogra-phy were performed and on October 30 a bilateral skull trephination was performed; *590 i. e., four incisions were made into the skull to determine any blood or fluid in the brain. He found a slight degree of fluid and damage and also evidence of contusion of the brain. He testified plaintiff was in an initial semiconsciousness state and remained in that condition for several days. He testified she was not oriented and suffered from emotional lability. She suffered from retrograde amnesia and could not recall any events prior to the accident nor any events about the accident. She was placed on an anti-convulsant medication because of the possibility of convulsions as a result of the brain injuries. Dr. Kirgis testified during most of her stay at Ochsner Hospital, plaintiff was unable to perform the normal body functions and required constant care.
She was seen again by Dr. Kirgis on June 10, 1969 after her release from Ochs-ner on December 11, 1968. She was still taking the anti-convulsant medication prescribed during her confinement at Ochs-ner’s Hospital. Dr. Kirgis determined the girl was still suffering from a degree of retrograde amnesia at that examination.
Dr. Kirgis concluded the plaintiff had suffered damage to the temporal and frontal areas of the brain. He stated plaintiff’s retrograde amnesia was of an excessive nature and this symptom indicated brain damage was caused to the frontal and temporal lobes of the brain. He testified she would walk with an unusual gait as a result of her brain injuries in that particular area. He also felt there was a distinct possibility that the girl would suffer seizures in the future as a result of her head injuries, but he noted that an electroencephalogram taken in 1969 showed these seizures not to be imminent at that time. It was his opinion plaintiff sustained a permanent disability of approximately 25% of her whole body.
Dr. Maybey testified when plaintiff was released on December 11, 1968 from Ochs-ner her health was “fairly good”. The pulmonary lung problem was completely healed; the gastrointestinal tract and kidneys were functioning properly although she was extremely weak. He felt cosmetic surgery was necessary to repair scars resulting from the tracheostomy tube and the incisions made into plaintiff’s limbs during the abdominal surgery. He also felt the girl would suffer physical disability as a result of the injuries to her hip area and her left hip would act as a barometer in that inclement weather would cause her some discomfort.
Plaintiff was discharged from Ochsner’s Hospital on December 11, 1968, and was moved to the Union City Clinic, Union City, Tennessee, to be near her home. The deposition of Dr. Byron O. Garner, plaintiff’s treating physician at ,Union City Clinic, was stipulated into evidence. He testified the girl stayed in the hospital for a total of eight days. When she was first brought to the hospital, she was moderately confused and required someone to do all her functions for her; she had a marked weakness of her body and her limbs, a tremendous weight loss, and a loss of use of her right arm and leg. His treatment was mainly nursing care and physiotherapy. The girl was placed on a course of exercises and heat massages to restore the use of her arm and leg and to aid her to regain her balance to sit alone and walk alone. He continued to see the plaintiff and testified that in June, 1969 she exhibited periods of time when she still could not remember events that had happened before the accident. In his opinion, plaintiff is suffering 25% total disability; that she is below a normal level of concentration and that she will never be the same as prior to the accident both mentally and physically. He did admit that the girl has made an excellent recovery considering her initial serious injuries. There was no conflicting medical testimony introduced by the defendants.
Plaintiff testified she could not remember any events concerning the accident nor events as far back as the prior summer. She stated she has difficulty with the intri *591 cate functions of her right hand, her reflexes are slower and her hip bothers her on bad days when she has been active or when the weather changes. She admits her condition has improved and the fading of her memory comes and goes and is not a constant amnesia as it was immediately after the accident.
As indicated above, the trial court awarded plaintiff the sum of $60,000.00 for pain, suffering and disfigurement and $35,000.00 for her “disability and loss of earning capacity”. The court made no determination as to what percentage of the $35,000.00 award was allocated to loss of plaintiff’s earning capacity. At the time of the accident she was contemplating a career as a commercial artist and her curriculum at Murray State University was geared toward that degree. However, at the time of the trial plaintiff had dropped out of school and was apparently a happily married housewife of two weeks. She testified she quit her courses at Murray State University because of her inability to concentrate and not because of her marriage. However, the record shows that prior to the accident plaintiff had experienced academic difficulties during her freshman year at Murray State University and had performed satisfactory work only in her art courses. After the accident, plaintiff remained out of school for a year and enrolled in the Fall semester of 1970. Her scholastic work remained the same, i. e., she performed in a satisfactory manner in her art work but had difficulty in her other courses. . Taking these facts into consideration, we feel any award to plaintiff for loss of earning capacity would be highly speculative and would be based upon mere conjecture. There is no guarantee plaintiff would have succeeded in attaining her goal as a commercial artist even though she had been successful in earning a degree in that field. We feel the evidence preponderates that plaintiff could have remained in college and that her ability to complete her courses was not greatly reduced as a result of her injuries. We feel the evidence establishes her decision to quit her studies at Murray State University was motivated by her decision to marry. We therefore reject any award for loss of future earnings.
With this initial statement in mind, we must therefore determine if any award should be granted to plaintiff, and if so, to what extent we will reduce or enlarge the judgment of the trial court. We find it unnecessary to break the award down into specific categories and our decision will reflect our consideration of the totality of the pain, suffering and disability endured by the plaintiff.
There is no question plaintiff’s injuries were extremely painful and she was very near death when admitted to Ochs-ner’s Foundation Hospital. She remained in a critical condition for a period of approximately six weeks following the accident and rehabilitation from these injuries has been a slow and painful process. Plaintiff was an attractive, active coed of 21 years at the time of the accident. There is no doubt she was affected by this tragic accident and her life style will forever be altered because of these painful injuries. We find the medical evidence has established that plaintiff has suffered a 25% total disability of the body functions which result from the brain and other physical injuries.
To aid this court in determining the amount of the award, we have been presented numerous cases dealing with the questions of disability, pain and suffering and injuries of a similar nature. See for example Reeder v. Allstate Insurance Company, 235 So.2d 111 (La.App., 4th cir. 1970); Brignac v. Pan American Petroleum Corporation, 224 So.2d 84 (La.App., 3rd cir. 1969); Spizer v. Dixie Brewing Company, 210 So.2d 528 (La.App., 4th cir. 1968); and Johns v. Hunt Lumber Company, 250 So.2d 543 (La.App., 2nd cir. 1971). We have considered these cases and the amounts of awards granted or approved by the appellate courts of this State solely as an indication of awards for similar injuries and we are not bound by the determina *592 tions of any case. As enunciated by the Supreme Court of Louisiana in Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149, each award must stand on the facts of the case. To sustain an award, there must be established a legal feasibility between the award and the evidence which supports it. After a careful review of the evidence, we feel a judgment of $60,000.00 for general damages is proper and within reason.
There has been no serious dispute as to the special damages awarded and we see no abuse in the trial court’s discretion in that part of the judgment.
Accordingly, for the foregoing reasons, the judgment appealed is amended to reduce the award to plaintiff, Virginia Cline, to the sum of $60,000.00 for all general damages, including pain, suffering, disfigurement and disability. This court affirms the award of $15,532.92 for “specials” for medical expenses incurred, subject to a credit of $9,973.38 previously paid by defendant insurance company. And, as amended, the judgment is affirmed at appellant’s cost.
Amended and affirmed.